120 T.C. No. 13

UNITED STATES TAX COURT

CHARLES T. MCCORD, JR., AND MARY S. MCCORD, DONORS, Petitioners
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7048-00.                    Filed May 14, 2003.

    Ps, their children, and their children's
partnership formed a family limited partnership (PT).
In 1996, Ps assigned interests in PT to several
assignees pursuant to an agreement that contains a
formula clause.  The formula clause provides that (1)
Ps' children, trusts for their benefit, and S, a
charitable organization, are to receive interests
having an aggregate fair market value of a set dollar
amount, and (2) C, another charitable organization, is
to receive any remaining portion of the assigned
interests.  Ps' children agreed to pay all transfer
taxes resulting from the transaction, including the
estate tax liability under then sec. 2035(c), I.R.C.
1986, that would arise if one or both Ps were to die
within 3 years of the date of the assignments.

    Pursuant to a second agreement, the assignees
allocated the assigned interests among themselves in

accordance with the formula clause, based on an agreed aggregate value of $7,369,277.60 for the assigned interests. Less than 6 months after the date of the assignment, PT redeemed the interests of S and C pursuant to a call option contained in PT's partnership agreement.

1. Held: Ps assigned only economic rights with respect to PT; such assignments did not confer partner status on the assignees.

2. Held, further, the aggregate fair market value of the interests assigned by Ps on the date of the gifts was $9,883,832.

3. Held, further, the amount of Ps' aggregate charitable contribution deduction under sec. 2522, I.R.C. 1986, resulting from the transfer to C is determined on the basis of the fair market value of the interest actually allocated to C under the second agreement, rather than the interest that would have been allocated to C under the second agreement had the donees determined a fair market value for the assigned interests equal to the fair market value determined by the Court.

4. Held, further, Ps' respective taxable gifts for 1996 are determined without reference to the contingent estate tax liability that their children assumed under the first agreement.


John W. Porter and Stephanie Loomis-Price, for petitioners.

Lillian D. Brigman and Wanda M. Cohen, for respondent.

Table of Contents

FINDINGS OF FACT........................................5
OPINION................................................15

   I.   Introduction.....................................15

  II.   Relevant Statutory Provisions....................16

 III.   Arguments of the Parties.........................18

  IV.   Extent of the Rights Assigned....................19

   V.   Fair Market Value of the Gifted Interest.........25
        A.   Introduction.................................25
           1.  General Principles.........................25
           2.  Expert Opinions...........................26
           a.  In General................................26
           b.  Petitioners' Expert.......................27
           c.  Respondent's Expert.......................28
        B.   Value of Underlying Assets...................28
        C.   Minority Interest (Lack of Control) Discount.....29
           1.  Introduction..............................29
           2.  Discount Factors by Asset Class...........30
           a.  Equity Portfolio..........................30
           (1)  Measurement Date..........................31
           (2)  Sample Funds..............................31
           (3)  Representative Discount Within the Range
                of Sample Fund Discounts..................34
           (4)  Summary...................................36
           b.  Municipal Bond Portfolio..................37
           (1)  Measurement Date..........................37
           (2)  Sample Funds..............................37
           (3)  Representative Discount Within the Range
                of Sample Fund Discounts..................38
           (4)  Summary...................................40
           c.  Real Estate Partnerships..................41
           (1)  The Appropriate Comparables...............41
           (2)  Determining the Discount Factor...........43
           d.  Direct Real Estate Holdings...............45
           e.  Oil and Gas Interests.....................46
           3.  Determination of the Minority
               Interest Discount.........................46
        D.   Marketability Discount.......................46
           1.  Introduction..............................46
           2.  Traditional Approaches to Measuring
               the Discount..............................47
           a.  In General................................47

b. Rejection of IPO Approach.....................48
3. Mr. Frazier's Restricted Stock Analysis.......50
4. Dr. Bajaj's Private Placement Analysis.......52
a. Comparison of Registered
   and Unregistered Private Placements..........52
b. Refinement of Registered/
   Unregistered Discount Differential............53
c. Further Adjustments..........................56
d. Application to MIL...........................56
5. Determination of the Marketability Discount...56
a. Discussion...................................56
b. Conclusion...................................59
E. Conclusion....................................59

VI. Charitable Contribution Deduction for
Transfer to CFT....................................60
A. Introduction.....................................60
B. The Assignment Agreement........................61
C. Conclusion......................................64

VII. Effect of Children's Agreement To Pay Estate
Tax Liability......................................65
A. Introduction.....................................65
B. Discussion......................................69
C. Conclusion......................................73

VIII. Conclusion........................................73

Judge Swift's Concurring Opinion..........................74
Judge Chiechi's Concurring in Part, Dissenting
in Part Opinion.........................................86
Judge Foley's Concurring in Part, Dissenting
in Part Opinion.........................................94
Judge Laro's Dissenting Opinion..........................109

HALPERN, Judge:  By separate notices of deficiency dated April 13, 2000 (the notices), respondent determined deficiencies in Federal gift tax for calendar year 1996 with respect to petitioner Charles McCord, Jr. (Mr. McCord) and petitioner Mary McCord (Mrs. McCord) in the amounts of $2,053,525 and $2,047,903, respectively.  The dispute centers around the gift tax consequence of petitioners' assignments to several charitable and noncharitable donees of interests in a family limited partnership.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect on the date of the assignments, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All dollar amounts have been rounded to the nearest dollar.

## FINDINGS OF FACT

Some facts are stipulated and are so found.  The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.

### Petitioners

Petitioners are husband and wife.  They have four sons, all adults (the children):  Charles III, Michael, Frederick, and Stephen.  In response to the notices, petitioners filed a single petition.  At the time they filed the petition, petitioners resided in Shreveport, Louisiana.

Formation of McCord Interests, Ltd., L.L.P.

McCord Interests, Ltd., L.L.P. (MIL or the partnership), is a Texas limited partnership formed on June 30, 1995, among petitioners, as class A limited partners; petitioners, the children, and another partnership formed by the children (McCord Brothers Partnership), as class B limited partners; and the children as general partners (all such partners being hereafter referred to as the initial MIL partners).

On formation, as well as on the date of the assignments in question, the principal assets of MIL were stocks, bonds, real estate, oil and gas investments, and other closely held business interests. On the date of the assignments, approximately 65 percent and 30 percent of the partnership's assets consisted of marketable securities and interests in real estate limited partnerships, respectively. The remaining approximately 5 percent of the partnership's assets consisted of direct real estate holdings, interests in oil and gas partnerships, and other oil and gas interests.

In mid-October 1995, the MIL partnership agreement was amended and restated, effective as of November 1, 1995 (such amended and restated partnership agreement being referred to hereafter as, simply, the partnership agreement). Attached to the partnership agreement is a schedule setting forth the capital

contributions and ownership interests of the initial MIL

partners, as follows:[1]

| Class and Contributor | Contribution | Percentage Interest |
|---|---|---|
| Class A limited partners: | | |
| Mr. McCord | $10,000 | -- |
| Mrs. McCord | 10,000 | -- |
| General partners: | | |
| Charles III | 40,000 | 0.26787417 |
| Michael | 40,000 | 0.26787417 |
| Frederick | 40,000 | 0.26787417 |
| Stephen | 40,000 | 0.26787417 |
| Class B limited partners: | | |
| Mr. McCord | 6,147,192 | 41.16684918 |
| Mrs. McCord | 6,147,192 | 41.16684918 |
| McCord Brothers | 2,478,000 | 16.59480496 |
| Total | 14,952,384 | 100.0 |

Relevant Provisions of the Partnership Agreement

Among other things, the partnership agreement provides as follows:

MIL will continue in existence until December 31, 2025 (the termination date), unless sooner terminated in accordance with the terms of the partnership agreement.

Any class B limited partner may withdraw from MIL prior to the termination date and receive a payment equal to the fair market value (as determined under the partnership agreement) of

[1]Under the terms of the partnership agreement, a class A limited partnership interest does not carry with it a "Percentage Interest" (as that term is defined in the partnership agreement) in MIL.

such partner's class B limited partnership interest (the put right).

Partners may freely assign their partnership interests to or for the benefit of certain family members and charitable organizations (permitted assignees).

A partner desiring to assign his partnership interest to someone other than a permitted assignee must first offer that interest to MIL and the other partners and assignees, who have the right to purchase such interest at fair market value (as determined under the partnership agreement).

The term "partnership interest" means the interest in the partnership representing any partner's right to receive distributions from the partnership and to receive allocations of partnership profit and loss.

Regardless of the identity of the assignee, no assignee of a partnership interest can attain the legal status of a partner in MIL without the unanimous consent of all MIL partners.

MIL may purchase the interest of any "charity assignee" (i.e., a permitted assignee of a partnership interest that is a charitable organization that has not been admitted as a partner of MIL) at any time for fair market value, as determined under the partnership agreement (the call right).

For purposes of the partnership agreement, (1) a class B limited partner's put right is disregarded for purposes of

determining the fair market value of such partner's class B limited partnership interest, and (2) any dispute with respect to the fair market value of any interest in MIL is to be resolved by arbitration as provided in Exhibit G attached to the partnership agreement.

Limited partners generally do not participate in the management of the partnership's affairs. However, limited partners do have veto power with respect to certain "major decisions", most notably relating to voluntary bankruptcy filings. In addition, if any two of the children are not serving as managing partners, class B limited partners have voting rights with respect to certain "large dollar" managerial decisions. Limited partners also have access to certain partnership financial information.

Southfield School Foundation

On November 20, 1995, petitioners assigned their respective class A limited partnership interests in MIL to the Hazel Kytle Endowment Fund of The Southfield School Foundation (the foundation) pursuant to an Assignment of Partnership Interest and Addendum Agreement (the Southfield agreement). The recitals to the Southfield agreement provide that "all of the partners of the Partnership desire that Assignee become a Class A Limited Partner of the Partnership upon execution of this Assignment of Partnership Interest" and "all consents required to effect the

conveyance of the Assigned Partnership Interest and the admission of Assignee as a Class A Limited Partner of the Partnership have been duly obtained and are evidenced by the signatures hereto". All of the initial MIL partners executed the Southfield agreement.

Further Assignments

On January 12, 1996 (the valuation date), petitioners, as assignors, entered into an assignment agreement (the assignment agreement) with respect to their class B limited partnership interests in MIL. The other parties to the assignment agreement (the assignees) were the children, four trusts for the benefit of the children (the trusts), and two charitable organizations-- Communities Foundation of Texas, Inc. (CFT) and Shreveport Symphony, Inc. (the symphony). By the assignment agreement, petitioners relinquished all dominion and control over the assigned partnership interests and assigned to the assignees all of their rights with respect to those interests. The assignment agreement does not contain language similar to that quoted above from the Southfield agreement regarding the admission of the assignees as partners of the partnership, and two of the partners of the partnership, McCord Brothers Partnership and the foundation, did not execute the assignment agreement in any capacity. The interests that petitioners assigned to the

assignees by way of the assignment agreement (collectively, the gifted interest) are the subject of this dispute.

Under the terms of a "formula clause" contained in the assignment agreement (the formula clause), the children and the trusts were to receive portions of the gifted interest having an aggregate fair market value of $6,910,933; if the fair market value of the gifted interest exceeded $6,910,933, then the symphony was to receive a portion of the gifted interest having a fair market value equal to such excess, up to $134,000; and, if any portion of the gifted interest remained after the allocations to the children, trusts, and symphony, then CFT was to receive that portion (i.e., the portion representing any residual value in excess of $7,044,933). The children (individually and as trustees of the trusts) agreed to be liable for all transfer taxes (i.e., Federal gift, estate, and generation-skipping transfer taxes, and any resulting State taxes) imposed on petitioners as a result of the conveyance of the gifted interest.

The assignment agreement leaves to the assignees the task of allocating the gifted interest among themselves; in other words, in accordance with the formula clause, the assignees were to allocate among themselves the approximately 82-percent partnership interest assigned to them by petitioners. In that regard, the assignment agreement contains the following instruction concerning valuation (the valuation instruction):

For purposes of this paragraph, the fair market value of the Assigned Partnership Interest as of the date of this Assignment Agreement shall be the price at which the Assigned Partnership Interest would change hands as of the date of this Assignment Agreement between a hypothetical willing buyer and a hypothetical willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.  Any dispute with respect to the allocation of the Assigned Partnership Interests among Assignees shall be resolved by arbitration as provided in the Partnership Agreement.

The Confirmation Agreement

In March 1996, the assignees executed a Confirmation Agreement (the confirmation agreement) allocating the gifted interest among themselves as follows:

| Assignee | Assigned Partnership Interest |
|---|---|
| Charles T. McCord, III, GST Trust | 8.24977954% |
| Michael S. McCord GST Trust | 8.24977954 |
| Frederick R. McCord GST Trust | 8.24977954 |
| Stephen L. McCord GST Trust | 8.24977954 |
| Charles III | 11.05342285 |
| Michael | 11.05342285 |
| Frederick | 11.05342285 |
| Stephen | 11.05342285 |
| CFT | 3.62376573 |
| Symphony | 1.49712307 |
| Total | 82.33369836% |

The assignees based that determination on an appraisal report, dated February 28, 1996, prepared at the behest of the children's

counsel[2] by Howard Frazier Barker Elliott, Inc. (HFBE). That report (the 1996 HFBE appraisal report) concludes that, taking into account discounts for lack of control and lack of marketability, the fair market value of a 1-percent "assignee's interest in the Class B Limited Partnership Interests" on the valuation date was $89,505.

Representatives of CFT and the symphony, respectively (including their respective outside counsel), reviewed the 1996 HFBE appraisal report and determined that it was not necessary to obtain their own appraisals. Furthermore, under the terms of the confirmation agreement, CFT and the symphony (as well as the other assignees) agreed not to seek any judicial alteration of the allocation in the confirmation agreement and waived their arbitration rights granted under the assignment agreement.

MIL's Exercise of the Call Right

On June 26, 1996, MIL exercised the call right with respect to the interests held by the symphony and CFT. It did so pursuant to a document styled "Agreement--Exercise of Call Option By McCord Interests, Ltd., L.L.P." (the exercise agreement). The purchase price for the redeemed interests was based on a two-page letter from HFBE (the HFBE letter) previewing an updated appraisal report to be prepared by HFBE. The HFBE letter

---

[2] The children's counsel had also represented petitioners in connection with the transaction. However, petitioners were not involved in the allocation of the gifted interest among the assignees pursuant to the confirmation agreement.

concludes that the fair market value of a 1-percent "assignee's interest in the Class B Limited Partnership Interests" as of June 25, 1996 was $93,540. CFT and the symphony raised no objections to the value found in the HFBE letter and accepted $338,967 and $140,041, respectively, in redemption of their interests.

The Gift Tax Returns

Petitioners timely filed Forms 709, United States Gift (and Generation Skipping Transfer) Tax Return, for 1996 (the Forms 709). In schedules attached to the Form 709, petitioners reported a gross value of $3,684,639 for their respective shares of the gifted interest. Each petitioner reduced that amount by the amount of Federal and State (Louisiana) gift tax generated by the transfer that the children agreed to pay as a condition of the gift. Each petitioner further reduced that amount by a computation of the actuarial value, as of the valuation date, of the contingent obligation of the children to pay (again, as a condition of the gift) the additional estate tax that would result from the transaction if that petitioner were to die within 3 years of the valuation date. Based on those adjustments, Mr. and Mrs. McCord reported total gifts of $2,475,896 and $2,482,605, respectively.[3] Mr. and Mrs. McCord each claimed an annual exclusion amount of $60,000 and a charitable contribution

---

[3] Those figures also reflect cash gifts of $10 by each petitioner to nominally fund the trusts.

deduction of $209,173, yielding taxable gifts of $2,206,724 and $2,213,432, respectively.

The Notices

By the notices, respondent determined deficiencies in gift tax with respect to Mr. and Mrs. McCord in the amounts of $2,053,525 and $2,047,903, respectively, based on increases in 1996 taxable gifts in the amounts of $3,740,904 and $3,730,439, respectively. Respondent determined that each petitioner (1) understated the gross value of his or her share of the gifted interest, and (2) improperly reduced such gross value by the actuarial value of the children's obligation to pay additional estate taxes potentially attributable to the transaction.

OPINION

I. Introduction

MIL is a Texas limited partnership formed on June 30, 1995. In exchange for their class B limited partnership interests in MIL, petitioners contributed to MIL closely held business interests, oil and gas interests, real estate, stocks, bonds, and other securities. The parties have stipulated that the value of petitioners' contributions in exchange for their class B limited partnership interests was $12,294,384 ($6,147,192 apiece). On January 12, 1996, petitioners assigned (as gifts) their partnership interests in MIL (the gifted interest). On that date, approximately 65 percent of the partnership's assets

consisted of marketable securities and approximately 30 percent consisted of interests in real estate limited partnerships. The assignees were petitioners' children, trusts for the benefit of the children, and two charitable organizations (Communities Foundation of Texas, Inc. (CFT) and Shreveport Symphony, Inc. (the symphony)). In calculations submitted with their Federal gift tax returns, petitioners reported the gross value of the gifted interest as $7,369,278 ($3,684,639 apiece). Respondent's adjustments reflect his determination that the gross fair market value of the gifted interest was $12,426,086 ($6,213,043 apiece). Principally, we must determine the fair market value of the gifted interest and whether each petitioner may reduce his or her one-half share thereof to account for the children's contingent obligation (as a condition of the gift) to pay the additional estate tax that would result from the transaction if that petitioner were to die within 3 years of the date of the gift. Preliminarily, we must determine whether petitioners transferred all of their rights as class B limited partners or only their economic rights with respect to MIL. We must also determine the amount of the gift to CFT.

II. Relevant Statutory Provisions

Section 2501(a) imposes a tax on the transfer of property by gift. Section 2512(a) provides that, if a gift is made in

property, the value of the property on the date of the gift is considered the amount of the gift. In determining the amount of "taxable gifts" for any particular year, a donor is entitled to deduct the amount of gifts made during the year that qualify for the charitable contribution deduction provided for in section 2522. Sec. 2503(a).

Section 2502(c) provides that the donor is the person liable for the payment of the gift tax. If a donor makes a gift subject to the condition that the donee pay the resulting gift tax, the amount of the gift is reduced by the amount of such gift tax. Rev. Rul. 75-72, 1975-1 C.B. 310. Such a gift is commonly referred to as a "net gift" (net gift).

Under section 2035(c) (current section 2035(b)), a decedent's gross estate is increased by the amount of any gift tax paid by the decedent or his estate on any gift made by the decedent during the 3-year period preceding the decedent's death. For purposes of this "gross-up" provision, gift tax "paid by the decedent or his estate" on gifts made during the relevant 3-year period is deemed to include gift tax attributable to net gifts made by the decedent during such period (i.e., even though the donees are responsible for paying the gift tax in such situation). Estate of Sachs v. Commissioner, 88 T.C. 769, 777-778 (1987), affd. in part and revd. in part on another ground 856 F.2d 1158, 1164 (8th Cir. 1988).

III.  Arguments of the Parties

Petitioners contend that they correctly valued the gifted interest in determining their respective taxable gifts. Petitioners contend in the alternative that, if we determine an increased value for the gifted interest, then, by operation of the formula clause in the assignment agreement, they are entitled to an identical increase in the amount of their aggregate charitable contribution deduction under section 2522, resulting in no additional gift tax due.[4]  Petitioners also contend that, under net gift principles enunciated in Rev. Rul. 75-72, supra, and Estate of Sachs v. Commissioner, supra, they properly reduced their respective taxable gifts by the actuarial value of the children's contingent obligation, under the terms of the assignment agreement, to pay additional estate tax under section 2035(c).

Respondent contends that petitioners undervalued the gifted interest by mischaracterizing the assignment and applying excessive discounts.  Respondent also contends that the formula clause in the assignment agreement, designed to neutralize the tax effect of any upward adjustment to the valuation of the gifted interest, is ineffectual.  Finally, respondent contends that petitioners improperly reduced the amount of their taxable

_____

[4]  Consistent with that argument, petitioners have preserved their right to claim an increased charitable contribution deduction under sec. 170 on an amended income tax return for 1996.  Petitioners' 1996 income tax liability is not before us.

gifts to account for the possibility that the children would be obligated to pay additional estate tax under section 2035(c) by reason of the transaction.

The parties have stipulated that respondent bears the burden of proof, and we accept that stipulation.[5]

## IV.   Extent of the Rights Assigned

The divergence of the parties' valuations of the gifted interest is attributable in part to their disagreement regarding the extent of the rights assigned by petitioners.  Petitioners contend that they assigned to the assignees certain rights with respect to their class B limited partnership interests in MIL but did not (and could not) admit the assignees as class B limited partners.  The assignment, they argue, did not entitle the assignees to exercise certain rights that petitioners possessed (as partners) under the partnership agreement.  Thus, they argue, the value of the gifted interest is something less than the value of all of their rights as class B limited partners.  Respondent, on the other hand, argues that the gifted interest consists of the sum and total of petitioners' rights as class B limited partners (i.e., that, as a result of the assignment, the

---

[5]  The parties have not informed us of their basis for stipulating that respondent bears the burden of proof.  The burden of proof is normally on petitioner.  See Rule 142(a)(1). Under certain circumstances, the burden of proof can be shifted to the Commissioner.  See sec. 7491; Rule 142(a)(2).  We assume (without deciding) that the conditions necessary to shift the burden to respondent have been satisfied.

assignees became class B limited partners).  The parties' experts agree that, if the gifted interest does not include all of petitioners' rights as class B limited partners, the fair market value of the gifted interest is lower than it would be if the gifted interest did include all such rights.

Whenever the concept of "property" is relevant for Federal tax purposes, it is State law that defines the property interest to which Federal tax consequences attach.  E.g., United States v. Craft, 535 U.S. 274, 278-279 (2002) (Federal tax lien attaches to property held, under State law, as tenants by the entireties).  Thus, in order to determine the Federal gift tax consequences that attach to petitioners' assignment of the gifted interest, we look to applicable State law to determine the extent of the rights transferred.  Because petitioners transferred interests in a Texas limited partnership, Texas law governs our determination in that regard.  Specifically, we look to the Texas Revised Limited Partnership Act (the Act), Tex. Rev. Civ. Stat. Ann. art. 6132a-1, as in effect on the date of the gift.

Under the Act, a partnership interest is personal property.  Tex. Rev. Civ. Stat. Ann. art. 6132a-1, sec. 7.01 (Vernon 2001).  A partnership interest is assignable in whole or in part unless the partnership agreement provides otherwise.  Id. sec. 7.02(a)(1).  However, an assignee of a partnership interest attains the legal status of a limited partner only if the

partnership agreement so provides or all of the partners consent. Id. sec. 7.04(a). Section 8.01 of the partnership agreement governs the admission of new partners to MIL. That section provides that, notwithstanding the occurrence of a valid assignment of a partnership interest in MIL in compliance with the terms of the partnership agreement, no person shall become a partner without the unanimous consent of the existing partners.

There is no evidence indicating that all of the MIL partners explicitly consented to the admission of the assignees as partners in MIL. Our inquiry does not end there, however. In Kerr v. Commissioner, 113 T.C. 449 (1999), affd. on another issue 292 F.3d 490 (5th Cir. 2002), we demonstrated our willingness to look beyond the formalities of intrafamily partnership transfers to determine what, in substance, was transferred. In that case, also involving Texas partnership law, the taxpayers argued that the interests they transferred to two grantor retained annuity trusts (GRATs) were "assignee interests"[6] because the other general partners of the partnership (the taxpayers' adult children, whose trusts were the remainder beneficiaries of the GRATs) did not consent to the admission of the GRATs as additional partners. Id. at 464. We found that such lack of formal consent did not preclude a finding that the taxpayers

_____

[6] For purposes of this report, we use the term "assignee interest" (assignee interest) to signify the interest held by an assignee of a partnership interest who has not been admitted as a partner in the partnership.

effected a transfer of all their rights as partners.  Id.  In essence, we inferred the necessary consent of the other general partners to admit the GRATs as partners based on all of the facts and circumstances.  Id. at 464-468.

Our decision in Kerr was influenced by a number of factors that are not present in this case.  For instance, the taxpayers in Kerr asked us to construe strictly the consent provision in their partnership agreement in the context of their transfers to the GRATs, notwithstanding the fact that they had disregarded that provision in other situations.  Id. at 464-465.  In addition, we found it difficult to reconcile the taxpayers' characterization of the transfers with the language of their assignment documents, each of which contained the following statement:  "The Assigned Partnership Interest constituted a Class B Limited Partnership interest in * * * [the partnership at issue] when owned by Assignor and, when owned by Assignee, shall constitute a Class B Limited Partnership Interest in said partnership."  Id. at 466.  Finally, from an economic reality standpoint, we found it significant that the taxpayers and their children, being all of the general partners of the partnership, could have formally admitted the assignee GRATs as partners at any time without having to obtain the consent of any other person.  Id. at 468.

In the instant case, there is no evidence that petitioners and the other partners of MIL ever disregarded section 8.01 of the partnership agreement, the provision on which they now rely. Indeed, when petitioners assigned their class A limited partnership interests to the foundation in 1995, all of the initial MIL partners consented in writing to the admission of the foundation as a class A limited partner, as required by said section 8.01. Furthermore, the assignment agreement with respect to the gifted interest does not contain language of the type quoted above from the Kerr assignment documents, nor does it contain any of the language in the Southfield agreement relating to the admission of the assignee as a partner in MIL. Finally, petitioners and their children could not unilaterally admit the assignees as partners in MIL; any such admission required the consent of the foundation, an unrelated third party.

Respondent makes note of the fact that the assignment agreement provides that "Assignors hereby relinquish all dominion and control over the Assigned Partnership Interest and assign to Assignees all of Assignors' rights with respect to the Assigned Partnership Interest". However, the issue in this case is not whether petitioners transferred partnership interests; under the terms of the Act, the partnership agreement, and the assignment agreement, they undoubtedly could and did. That having been said, both the Act and the partnership agreement define the term

"partnership interest" in terms of economic rights (and do not equate the term with membership in the partnership).[7] Thus, it is entirely consistent to say that petitioners assigned all of their rights with respect to their partnership interests, yet did not assign all of their rights as class B limited partners (i.e., did not cause the assignees to be admitted as substitute class B limited partners).

In sum, we conclude that the facts in this case do not permit us to infer, as we did in Kerr, that petitioners intended to transfer all of their rights as partners and that all of the other partners effectively consented to the admission of the assignees as partners. Rather, petitioners assigned only economic rights with respect to MIL, and we shall proceed to value the gifted interest on that basis.[8]

---

[7] The partnership agreement provides that the term "partnership interest" means the interest in the partnership representing any partner's right to receive distributions from the partnership and to receive allocations of partnership profit and loss. The statutory definition is similarly worded. See Tex. Rev. Civ. Stat. Ann. art. 6132a-1, sec. 1.02(11) (Vernon 2001) (the Act) and accompanying bar committee comment; see also id. sec. 7.02(a)(1), (3), and (4) (assignment of partnership interest entitles the assignee to distributions and allocations, but the assignor continues to be a partner and to have the power to exercise any rights or powers of a partner, until the assignee becomes a partner).

[8] To use the terminology favored by the parties, we shall value the gifted interest as an assignee interest.

V. <u>Fair Market Value of the Gifted Interest</u>

    A.   <u>Introduction</u>

        1.   <u>General Principles</u>

Section 25.2512-1, Gift Tax Regs., provides that the value of property for gift tax purposes is "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts."[9] The willing buyer and willing seller are hypothetical persons, rather than specific individuals or entities, and their characteristics are not necessarily the same as those of the donor and the donee. <u>Estate of Newhouse v. Commissioner</u>, 94 T.C. 193, 218 (1990) (citing <u>Estate of Bright v. United States</u>, 658 F.2d 999, 1006 (5th Cir. 1981)).[10] The hypothetical willing buyer and willing

---

[9] Relying on <u>Morrissey v. Commissioner</u>, 243 F.3d 1145, 1148 (9th Cir. 2001), revg. <u>Estate of Kaufman v. Commissioner</u>, T.C. Memo. 1999-119, and <u>Estate of Smith v. Commissioner</u>, T.C. Memo. 1999-368, petitioners contend that the confirmation agreement is conclusive proof of the value of the gifted interest because such agreement was an arm's-length transaction that was the "functional equivalent of an actual sale." We disagree. Suffice it to say that, in the long run, it is against the economic interest of a charitable organization to look a gift horse in the mouth.

[10] Although the cited cases involved the estate tax, it is well settled that the estate tax and the gift tax, being in pari materia, should be construed together. See, e.g., <u>Shepherd v. Commissioner</u>, 283 F.3d 1258, 1262 n.7 (11th Cir. 2002) (citing <u>Harris v. Commissioner</u>, 340 U.S. 106, 107 (1950)), affg. 115 T.C. 376 (2000).

seller are presumed to be dedicated to achieving the maximum economic advantage.  <u>Id.</u> at 218.

> 2.  <u>Expert Opinions</u>

> a.  <u>In General</u>

In deciding valuation cases, courts often look to the opinions of expert witnesses.  Nonetheless, we are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. <u>Helvering v. Natl. Grocery Co.</u>, 304 U.S. 282, 295 (1938); <u>Estate of Newhouse v. Commissioner</u>, <u>supra</u> at 217.  Although we may largely accept the opinion of one party's expert over that of the other party's expert, see <u>Buffalo Tool & Die Manufacturing Co. v. Commissioner</u>, 74 T.C. 441, 452 (1980), we may be selective in determining what portions of each expert's opinion, if any, to accept, <u>Parker v. Commissioner</u>, 86 T.C. 547, 562 (1986). Finally, because valuation necessarily involves an approximation, the figure at which we arrive need not be directly traceable to specific testimony if it is within the range of values that may be properly derived from consideration of all the evidence. <u>Estate of True v. Commissioner</u>, T.C. Memo. 2001-167 (citing <u>Silverman v. Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285).

b.  Petitioners' Expert

Petitioners offered William H. Frazier (Mr. Frazier) as an expert witness to testify concerning the valuation of the gifted interest.  Mr. Frazier is a principal of Howard Frazier Barker Elliott, Inc. (HFBE), a Houston-based valuation and consulting firm.  He is a senior member of the American Society of Appraisers and has been involved in valuation and general investment banking activities since 1975.  The Court accepted Mr. Frazier as an expert in the valuation of closely held entities and received written reports of HFBE into evidence as Mr. Frazier's direct and rebuttal testimony, respectively.

In his direct testimony, Mr. Frazier concludes that, based on a 22-percent minority interest discount and a 35-percent marketability discount, the fair market value of a 1-percent assignee interest in MIL on the valuation date was $89,505. Based on that figure, Mr. Frazier further concludes that the fair market value of each petitioner's one-half share of the gifted interest on the valuation date was $3,684,634 (a figure that, due to rounding, is slightly lower than the value reported on the Forms 709).[11]

---

[11]  Mr. Frazier asserts that a 41.167-percent assignee interest in MIL (i.e., one-half of the gifted interest) has no more proportionate value than a 1-percent assignee interest therein, and respondent's expert does not dispute that assertion.

c.  Respondent's Expert

Respondent offered Mukesh Bajaj, Ph.D. (Dr. Bajaj), as an expert witness to testify concerning the valuation of closely held entities.  Dr. Bajaj is the managing director of the finance and damages practice of LEC, LLC.  He also has experience as a university professor of finance and business economics.  Dr. Bajaj has lectured extensively on valuation issues, and he has testified as an expert in several valuation cases.  The Court accepted Dr. Bajaj as an expert in the valuation of closely held entities and received his written reports into evidence as his direct and rebuttal testimony, respectively.

In his direct testimony, Dr. Bajaj concludes that, based on an 8.34-percent minority interest discount and a 7-percent marketability discount, the fair market value of a 1-percent assignee interest in MIL on the valuation date was $150,665.64.  Based on that figure, Dr. Bajaj further concludes that the fair market value of each petitioner's one-half share of the gifted interest on the valuation date was $6,202,429.67.

B.  Value of Underlying Assets

The parties agree that, on the valuation date, MIL's net asset value (NAV) was $17,673,760, broken down by asset class as follows:

| Asset Type | Value |
|---|---|
| Equities portfolio | $3,641,956 |
| Bond portfolio | 8,040,220 |
| Real estate partnerships | 5,194,933 |

|                        |            |
|------------------------|------------|
| Real estate            | 581,553    |
| Oil and gas interests  | 215,098    |
| Total                  | 17,673,760 |

In determining the value of the gifted interest, Mr. Frazier first (i.e., before applying any discounts) subtracts $20,000 from MIL's NAV to reflect the class A limited partner's $20,000 priority claim against MIL's assets under the terms of the partnership agreement.[12]  Dr. Bajaj makes no such preliminary adjustment.  We concur with Mr. Frazier's approach in that regard, and, therefore, we conclude that the appropriate base amount for determining the value of the gifted interest is $17,653,760.[13]

C.  Minority Interest (Lack of Control) Discount

1.  Introduction

A hypothetical buyer of the gifted interest would have virtually no control over his investment.  For instance, such

---

[12]  We note that the class A limited partner's sole economic interest in MIL consists of a guaranteed payment for the use of such partner's (nominal) capital.  This case does not require us to determine whether the class A limited partner is a partner of MIL for Federal tax purposes.

[13]  For purposes of determining MIL's NAV, Mr. Frazier does not apply discounts to the real estate limited partnership interests that McCord Brothers Partnership contributed to MIL upon formation.  Mr. Frazier did, however, discount the value of those real estate limited partnership interests by 57.75 percent for purposes of valuing McCord Brothers Partnership's capital contribution to MIL and determining the MIL partners' percentage interests in MIL.  This case does not require us to address the gift tax consequences, if any, of the initial capital contributions to, and allocation of percentage interests in, MIL.

holder (1) would have no say in MIL's investment strategy, and (2) could not unilaterally recoup his investment by forcing MIL either to redeem his interest or to undergo a complete liquidation. Mr. Frazier and Dr. Bajaj agree that the hypothetical "willing buyer" of the gifted interest would account for such lack of control by demanding a reduced sales price; i.e., a price that is less than the gifted interest's pro rata share of MIL's NAV. They further agree that, in the case of an investment company such as MIL, the minority interest discount should equal the weighted average of minority interest discount factors determined for each type of investment held by MIL: equities, municipal bonds, real estate interests, and oil and gas interests.

### 2. Discount Factors by Asset Class

### a. Equity Portfolio

Mr. Frazier and Dr. Bajaj both determine the minority interest discount factor for MIL's equity portfolio by reference to publicly traded, closed end equity investment funds. Specifically, they both derive a range of discounts by determining for a sample of closed end equity funds the discount at which a share of each sample fund trades relative to its pro rata share of the NAV of the fund.[14] They differ in their

---

[14] Unlike a shareholder of an open-end fund, a shareholder of a closed end fund cannot, at will, by tendering his shares to the fund for repurchase, obtain the liquidation value of his
(continued...)

selection of measurement dates, sample funds, and representative discounts within the range of the sample fund discounts.

### (1)  Measurement Date

Mr. Frazier calculates discounts for his sample of closed end equity funds on the basis of January 11, 1996, trading prices and December 22, 1995, NAV information.  Dr. Bajaj, on the other hand, utilizes trading prices and NAV data as of the valuation date; i.e., January 12, 1996.  We agree with Dr. Bajaj that, to the extent possible, data from January 12, 1996, should be utilized to determine discounts with respect to the sample funds.

### (2)  Sample of Funds

Mr. Frazier derives his sample of closed end equity funds from the list of "domestic equity funds" set forth in Morningstar's Mutual Funds Guide.  From that list, he purports to exclude from consideration "special purpose" funds (i.e., those primarily invested in a specific industry), funds with a stated maturity, and funds "that had provisions regarding votes to open-

---

[14](...continued)
investment (i.e., his pro rata share of the fund's NAV).  For that reason, a share of a closed end fund typically trades at a discount relative to its pro rata share of the fund's NAV.  Since, according to the expert witnesses, that discount has no marketability element, it is, to some extent, considered reflective of a minority interest discount.

end the fund."[15]  That screening process produced a sample of 14 funds.

Dr. Bajaj derives his sample of closed end equity funds from the list of "general equity" funds set forth in the January 12, 1996 edition of the Wall Street Journal.  For reasons not entirely clear, Dr. Bajaj excludes two of those funds from consideration, leaving a sample of 20 funds.[16]

Dr. Bajaj's sample contains nine funds that Mr. Frazier excludes from his sample.  With regard to the first two of Mr. Frazier's three screening criteria, Dr. Bajaj states in his rebuttal testimony that none of those nine funds was a special purpose fund and that none had a stated maturity date.  With regard to Mr. Frazier's third screening criterion, Dr. Bajaj states that the fact that a fund's shareholders can vote to open-end the fund does not mean that such a conversion is imminent. Dr. Bajaj also states that the summary descriptions (contained in Mr. Frazier's direct testimony) of five of the funds included by

---

[15]  As noted earlier, a shareholder of an open-end fund generally can obtain the liquidation value of his investment (i.e., his pro rata share of the fund's NAV) by tendering his shares to the fund for repurchase.  It stands to reason that, to the extent the conversion of a closed end fund to open-end status is imminent, the share price of such fund will tend to approach the fund's NAV per share.

[16]  In his direct testimony, Dr. Bajaj states that the two excluded funds "could not be identified in Morningstar Principia dataset as of December 31, 1996".  Since Mr. Frazier excludes those funds from his sample as well, we similarly exclude them from consideration.

Mr. Frazier in his sample of funds mention open-ending votes or procedures, which, according to Mr. Frazier's criteria, should have required their exclusion.

In his rebuttal testimony, Mr. Frazier does not directly challenge Dr. Bajaj's inclusion of any specific fund in his sample; rather, he simply asserts that "some of these funds could have announced their intent to convert to an open-end fund" and that "other funds may be non-diversified". In the absence of more specific objections to Dr. Bajaj's additional sample funds, we are persuaded to include such funds in our own analysis.

Mr. Frazier's sample contains three funds that Dr. Bajaj excludes from his sample: Gemini II, Quest for Value, and Liberty All Star Growth Fund. Gemini II and Quest for Value were "dual purpose" funds, which were scheduled for either liquidation or open-ending in January 1997.[17] Given the effect that the impending liquidation or conversion may have had on share prices of those funds, we exclude them from our analysis. Since Dr. Bajaj's rebuttal testimony raises no specific objection to the inclusion of Liberty All Star Growth Fund in the sample, we include that fund in our analysis.[18]

---

[17] A dual purpose fund has both income shares and capital shares. At a set expiration date, the fund redeems all income shares, and the capital shareholders then vote either to liquidate the fund or convert it to open-end status.

[18] Dr. Bajaj may have excluded Liberty All Star Growth Fund from his sample due to the lack of NAV information with respect
(continued...)

(3)  Representative Discount Within the Range of Sample
     Fund Discounts

Mr. Frazier concludes that, because an interest in MIL's equity portfolio would not compare favorably to an interest in an institutional fund, the minority interest discount factor for MIL's equity portfolio should derive from the higher end of the sample's range of discounts.  Dr. Bajaj, on the other hand, concludes that such discount factor should derive from the lower end of the range of discounts.  For the reasons discussed below, we find neither expert's arguments convincing on that point.

Mr. Frazier concludes that a higher than average minority interest discount factor for MIL's equity portfolio is warranted in part because of the relative anonymity of MIL's investment managers, the relatively small size of MIL's equity portfolio, and MIL's policy of not making distributions (other than distributions to satisfy tax obligations).  However, Mr. Frazier elsewhere testifies that, based on his regression analysis, there is no clear correlation between the discounts observed in his sample of closed end funds and any of the variables he analyzed, including Morningstar rating (largely indicative of management reputation), the size of the fund, and distributions as a percentage of NAV.  We are similarly unpersuaded by Mr. Frazier's

_____

[18](...continued)
to such fund as of the valuation date.  For purposes of our analysis, we utilize the fund's NAV and price data as of Jan. 5, 1996, which is in the record.

assertion (unsupported by empirical evidence) that <u>fewer</u>
administrative and regulatory controls on MIL's investment
activity (as compared to that of institutional funds) should
result in a <u>higher</u> discount factor as a matter of course.[19]

Dr. Bajaj's argument that the minority interest discount
factor for MIL's equity portfolio should derive from the <u>lower</u>
end of the range of observed discounts is based primarily on the
premise that, on the valuation date, MIL was akin to a new
investment fund.  Dr. Bajaj's research, along with that of others
cited in his direct testimony, indicates that new investment
funds tend to trade at lower discounts than seasoned funds.
However, Dr. Bajaj's analysis fails to recognize that, while MIL
was a relatively new entity on the valuation date, its equity
portfolio had been in place (in the hands of the contributing
partners) for years.  Furthermore, of the four factors that Dr.
Bajaj specifically identifies as possible determinants of lower
initial fund discounts, only one--lack of unrealized capital
gains--perhaps would have informed the pricing decision of a
hypothetical buyer of an interest in MIL.[20]  The other factors

---

[19]  For instance, less regulation implies lower compliance
costs, which seemingly would offset, at least to some extent, any
pricing effect of relatively lax investor protections.

[20]  Although MIL inherited any unrealized gain with respect
to assets contributed by the initial MIL partners, see sec. 723,
the portion of such precontribution gain otherwise allocable to a
subsequent purchaser of an interest in MIL, see sec. 1.704-
3(a)(7), Income Tax Regs., generally would be eliminated if the
                                                  (continued...)

cited by Dr. Bajaj (the initial diminution of fund NAV relative to issue proceeds due to flotation and other startup costs, the prevalence of new funds in "hot" investment sectors, and the initial lack of management inefficiencies) simply do not readily translate from the public capital markets to the hypothetical private sale of an interest in MIL.

Because we are unpersuaded by the respective arguments of Mr. Frazier and Dr. Bajaj for a higher than average or lower than average minority interest discount factor for MIL's equity portfolio, we utilize the average discount of the sample funds under consideration.[21]

### (4) Summary

In determining the appropriate minority interest discount factor for MIL's equity portfolio, we utilize (1) Dr. Bajaj's price and NAV data as of January 12, 1996 (with the exception of Liberty All Star Growth Fund, for which we utilize NAV data from January 5, 1996, contained in the record); (2) Dr. Bajaj's sample of funds, with the addition of Liberty All Star Growth Fund; and

---

[20](...continued)
general partners of MIL were to agree to make a timely sec. 754 election with respect to MIL.  See secs. 754, 743(b); sec. 1.755-1(b)(1)(ii), Income Tax Regs.  The same would be true with respect to any postcontribution unrealized appreciation with respect to MIL's assets.

[21]  In their reports, Mr. Frazier and Dr. Bajaj determine the average, but not the weighted average, of the discounts with respect to the equity funds in their respective samples.  We follow the same approach here.

(3) the average discount of the sample funds.  The resulting discount factor is 9.96 percent, which we round up to 10 percent.

### b.  Municipal Bond Portfolio

Both Mr. Frazier and Dr. Bajaj determine the minority interest discount factor for MIL's municipal bond portfolio by reference to publicly traded, closed end municipal bond investment funds.  Once again, they disagree on measurement dates, sample funds, and representative discounts within the range of the sample fund discounts.

### (1)  Measurement Date

Mr. Frazier calculates discounts for his sample closed end municipal bond funds on the basis of January 11, 1996, trading prices and December 25, 1995, NAV data.  Dr. Bajaj utilizes trading prices and NAV information as of the valuation date; i.e., January 12, 1996.  We agree with Dr. Bajaj that, to the extent possible, data from January 12, 1996, should be utilized in determining discounts with respect to the sample funds.

### (2)  Sample of Funds

Mr. Frazier derives his sample of closed end municipal bond funds from the list of municipal bond funds set forth in Morningstar's Mutual Funds Guide.  In his direct testimony, Mr. Frazier indicates that he excluded from consideration funds that were "heavily weighted toward a specific sector" and funds with scheduled liquidation dates.  With regard to the first screening

factor, it appears that Mr. Frazier was referring to single-State funds.  Mr. Frazier's screening process produced a sample of eight funds.

Dr. Bajaj derives his sample from the list of 140 closed end municipal bond funds set forth in the January 15, 1996 edition of the Wall Street Journal.  For reasons not entirely clear, Dr. Bajaj excludes six of the funds from consideration, leaving a sample of 134 funds.[22]  That sample includes numerous single-State funds and funds with scheduled liquidation dates.

We agree with Mr. Frazier that funds with scheduled liquidation dates should not be included in the sample.  However, given the fact that Louisiana-based obligations accounted for approximately 75 percent of the value of MIL's bond portfolio, we are somewhat puzzled by Mr. Frazier's exclusion of single-State funds from his sample.  Indeed, we believe that the sample should consist entirely of single-State funds.  We therefore utilize a sample consisting of the 62 single-State funds in Dr. Bajaj's sample that do not have scheduled liquidation dates.

(3)  Representative Discount Within the Range of Sample Fund Discounts

As is the case with MIL's equity portfolio, Mr. Frazier concludes that the minority interest discount factor for MIL's bond portfolio should derive from the higher end of the sample's

_____

[22]  In his direct testimony, Dr. Bajaj states that the six excluded funds "could not be identified in Morningstar Principia dataset as of December 31, 1996".

range of discounts, while Dr. Bajaj concludes that such discount factor should derive from the lower end of the range of discounts. Once again, we find neither expert's arguments convincing on this point.

Mr. Frazier states that, according to his regression analysis, the three factors that are the most determinative of discounts with respect to the closed end funds in his sample are (1) distributions as a percentage of NAV, (2) built-in gain as a percentage of NAV, and (3) 3-year average annual return. We see no error in Mr. Frazier's calculation of his first factor, although he seems to take the same factor into account as an aspect of the discount for lack of marketability. With regard to the second two factors, Mr. Frazier provides no data with respect to MIL's bond portfolio that can be compared to the data from his sample funds. Mr. Frazier also repeats factors that he deemed relevant in the context of MIL's equity portfolio, notwithstanding the fact that his own regression analysis indicates little, if any, correlation between those factors (management quality and the size of the fund) and the level of discounts in his bond fund sample.[23]

---

[23] Mr. Frazier's regression analysis produced R-squared calculations of 0.29 for the Morningstar rating (management quality) variable and 0.01 for the fund size variable. Elsewhere in his direct testimony, Mr. Frazier indicates that an R-squared calculation of 0.34 is "relatively low", leading to the conclusion of "no clear correlation" between the variable in question and the level of sample fund discounts.

Dr. Bajaj applies his "new fund" analysis, discussed above in the context of MIL's equity portfolio, to MIL's bond portfolio as well. Again, Dr. Bajaj's analysis fails to recognize that, while MIL was a relatively new entity on the valuation date, its bond portfolio had been in place (in the hands of the contributing partners) for years. For that reason and the other reasons discussed supra in section V.C.2.a.(3), we reject this portion of Dr. Bajaj's analysis.

Because we are unpersuaded by the respective arguments of Mr. Frazier and Dr. Bajaj for a higher than average or lower than average minority interest discount factor for MIL's bond portfolio, we utilize the average discount of the sample funds under consideration.[24]

### (4) Summary

In determining the appropriate minority interest discount factor for MIL's bond portfolio, we utilize (1) Dr. Bajaj's price and NAV data as of January 12, 1996, (2) a sample of funds consisting of the 62 single-State funds in Dr. Bajaj's sample that do not have scheduled liquidation dates, and (3) the average discount of the sample funds. The resulting discount factor is 9.76 percent, which we round up to 10 percent.

---

[24] In their reports, Mr. Frazier and Dr. Bajaj determine the average, but not the weighted average, of the discounts with respect to the bond funds in their respective samples. We follow the same approach here.

c. Real Estate Partnerships[25]

(1) The Appropriate Comparables

In contrast to their opinions regarding MIL's equity and bond portfolios, Dr. Bajaj and Mr. Frazier sharply disagree on the general type of publicly traded entity from which to extrapolate the minority interest discount factor for MIL's real estate partnership interests. Dr. Bajaj argues that the discount factor should be based on data pertaining to real estate investment trusts (REITs).[26] Mr. Frazier, on the other hand, excludes REITs from consideration "since they are primarily priced on a current yield basis because REITs are required by law to annually pay out a large portion of earnings to shareholders." That justification overlooks the fact that the investment funds Mr. Frazier analyzes in determining the minority interest discount factors for MIL's equity and bond portfolios are also required to distribute substantially all of their income each year in order to maintain their tax-favored status as regulated investment companies (RICs). Compare sec. 852(a)(1) (income distribution requirement for RICs) with sec. 857(a)(1) (income distribution requirement for REITs). In the absence of any

---

[25] Dr. Bajaj limits his real estate analysis to MIL's real estate partnership interests. We address the minority interest discount factor for MIL's direct real estate holdings infra in sec. V.C.2.d.

[26] A real estate investment trust is a tax-favored vehicle through which numerous investors can pool their resources to invest in real estate. See secs. 856-859.

explanation as to why the current distribution requirement should disqualify REITs (but not RICs) from consideration in our analysis, we are persuaded to evaluate the REIT data.

We are further persuaded to utilize the REIT data in light of the alternative offered by Mr. Frazier. Mr. Frazier's search for "comparable" publicly traded real estate companies yielded a sample of five companies, and he derives his range of discounts from only three of those companies. While we have utilized small samples in other valuation contexts, we have also recognized the basic premise that "[a]s similarity to the company to be valued decreases, the number of required comparables increases". Estate of Heck v. Commissioner, T.C. Memo. 2002-34. One of Mr. Frazier's three sample companies developed planned communities, conducted farming operations, and owned royalty interests in more than 200 oil and gas wells. Another owned and managed shopping centers and malls and developed the master-planned community of Columbia, Maryland. The assets and activities of those companies are not sufficiently similar to those of MIL's real estate partnerships to justify the use of such a small sample.[27]

In contrast, Dr. Bajaj's REIT sample consists of 62 companies. In recognition of the fact that two of the real estate limited partnerships in which MIL was a partner owned

---

[27] Cf. Estate of Desmond v. Commissioner, T.C. Memo. 1999-76 (approving the use of the market approach for valuing an operating business based on two guideline companies in the same --as opposed to similar--line of business).

unimproved land that could be used for a variety of purposes, Dr. Bajaj's sample includes REITs specializing in a broad array of real estate investments, including office, residential, and retail properties.  Given the size of the sample, we believe that any dissimilarities in the assets and activities of particular REITs in the sample as compared to those of MIL's real estate partnerships are tolerable.[28]

(2)  <u>Determining the Discount Factor</u>

Because REITs offer investors the opportunity to invest in an illiquid asset (i.e., the underlying real estate) in liquid form (i.e., the REIT shares), investors in REITs are willing to pay a liquidity premium (relative to NAV) to invest in REIT shares.  According to Dr. Bajaj, that does not imply that a minority discount is nonexistent; it only means that the difference between price and NAV for a REIT may have two components, one positive (the liquidity premium) and one negative (the minority discount).  From his sample data, Dr. Bajaj calculated a median price-to-NAV premium of 3.7 percent.  To be conservative and to reflect MIL's distribution policy, Dr. Bajaj looked below the median, to the 25th percentile, and began with a price-to-NAV discount of 1.3 percent (an adjustment to NAV of minus (-) 1.3 percent).  Since Dr. Bajaj believes that that

---

[28]  We note that, while Mr. Frazier questions the composition of Dr. Bajaj's sample of REITs, he offers no specific suggestions for modifying the sample.

adjustment reflects both a minority discount and a (smaller) liquidity premium, he then proceeded to identify (and eliminate the effect of) the liquidity premium in order to determine the minority discount. Based on his opinion that, as of the valuation date, the prevailing "illiquidity" discount for privately placed restricted stock was approximately 7 percent, he calculated a 7.53-percent liquidity premium.[29] Based on that liquidity premium of 7.53 percent and his selected price-to-NAV discount of 1.3 percent from his REIT sample, Dr. Bajaj added the two percentages to calculate a minority discount of 8.83 percent (i.e., he increased the price-to-NAV discount to reflect the elimination of the effect of the liquidity premium), which he rounded to 9 percent.

Using the same procedure as Dr. Bajaj, but substituting an illiquidity discount of 18 percent for his 7-percent figure, we arrive at a liquidity premium of 22 percent and therefore conclude that the minority discount imbedded in the 1.3-percent price-to-NAV discount selected from the REIT sample is 23.3 percent, which we shall apply to MIL's real estate partnership interests. We have substituted 18 percent for 7 percent because, as discussed infra in section V.D.5.a., Dr. Bajaj has not been clear in distinguishing between the apparently different (but

---

[29] As Dr. Bajaj explains his calculation: "If an illiquid security trades at a discount of 7% relative to a liquid asset, this suggests that the liquid asset is trading at a premium of about 7.53% relative to the illiquid asset (1/[1-7%])."

overlapping) concepts of "marketability" and "liquidity". Our substitute percentage derives from a published study referenced in his direct testimony (the Wruck study)[30] which reported that, on average, discounts observed in private placements of unregistered shares exceeded those observed in private placements of registered shares (freely tradable in the public market) by 17.6 percentage points, which we round up to 18 percent. The theory, discussed in more detail infra in section V.D.4., is that such additional discount represents, to some degree, pure illiquidity concerns, since a ready, public market is available to owners of registered shares and unavailable to owners of restricted shares.

### d. Direct Real Estate Holdings

Respondent has instructed Dr. Bajaj to base his value conclusion regarding MIL's direct real estate holdings on the 40-percent minority interest discount factor for those assets appearing in the 1996 HFBE appraisal report. On that basis, we find that the minority interest discount factor for MIL's direct real estate holdings is 40 percent.

### e. Oil and Gas Interests

Mr. Frazier assigns a 33.5-percent minority interest discount factor to MIL's oil and gas interests. Respondent has

---

[30] Wruck, "Equity Ownership Concentration and Firm Value: Evidence from Private Equity Financings," 23 J. Fin. Econ. 3 (1989).

instructed Dr. Bajaj to base his value conclusion regarding the
oil and gas component of MIL's portfolio on the 33.5-percent
minority interest discount factor for those assets appearing in
the 1996 HFBE appraisal report.  On that basis, we find that the
minority interest discount factor for MIL's oil and gas
investments is 33.5 percent.

     3.  Determination of the Minority Interest Discount

The minority interest discount factors determined above
yield a weighted average discount of 15.18 percent, determined as
follows:[31]

| Asset Class | Percent of NAV | Percent Disc. Factor | Percent Weighted Average |
|---|---|---|---|
| Equities | 20.6 | 10.0 | 2.06 |
| Bonds | 45.5 | 10.0 | 4.55 |
| R.E. pships. | 29.4 | 23.3 | 6.85 |
| Real estate | 3.3 | 40.0 | 1.32 |
| Oil and gas | 1.2 | 33.5 | 0.40 |
| discount | | | 15.18 |

Rounding to the nearest percentage point, we conclude that the
appropriate minority interest discount with respect to the gifted
interest is 15 percent.

    D.  Marketability Discount

     1.  Introduction

The parties agree that, to reflect the lack of a ready
market for assignee interests in MIL, an additional discount
(after applying the minority interest discount) should be applied

---

[31]  Mr. Frazier and Dr. Bajaj agree on the percentages of
NAV assigned to each asset class.

to the net asset value of MIL's assets to determine the fair market value of the gifted interest.  Such a discount is commonly referred to as a "marketability discount".  The marketability discount analyses of Mr. Frazier and Dr. Bajaj differ from their minority interest discount analyses in that they seek to identify a single, "entity-wide" discount rather than a weighted average of discount factors specific to each category of assets held by MIL.  The parties disagree as to the amount of that discount.

2.  Traditional Approaches to Measuring the Discount

a.  In General

Mr. Frazier and Dr. Bajaj agree that empirical studies of the marketability discount fall into two major categories.  The first major category, the IPO approach, consists of studies that compare the private-market price of shares sold before a company goes public with the public-market price obtained in the initial public offering (IPO) of the shares or shortly thereafter.  The second major category, the restricted stock approach, consists of studies that compare the private-market price of restricted shares of public companies (i.e., shares that, because they have not been registered with the Securities and Exchange Commission, generally cannot be sold in the public market for a 2-year period)[32] with their coeval public-market price.  Mr. Frazier

---

[32]  See 17 C.F.R. sec. 230.144(d)(1) (1996).  The required holding period was shortened to 1 year in 1997.  See 62 Fed. Reg. 9242 (Feb. 28, 1997).

relies primarily on data from the restricted stock approach to support a marketability discount of 35 percent, although he also contends that data from the IPO approach strongly support that level of discount. Dr. Bajaj relies on a variant of the restricted stock approach, which we shall refer to as the private placement approach, to support a marketability discount of 7 percent.

### b. Rejection of IPO Approach

Dr. Bajaj argues that the IPO approach is flawed both in concept and in application. His principal criticism is that the IPO premium (over the pre-IPO private market price) may reflect more than just the availability of a ready market. He believes that buyers of shares prior to the IPO are likely to be insiders who provide services to the firm and who are compensated, at least in part, by a bargain price. More importantly, he believes that a pre-IPO purchaser demands compensation (in the form of a lower price) for bearing the risk that the IPO will not occur or will occur at a lower price than expected. His opinion is: "[T]he IPO approach probably generates inflated estimates of the marketability discount. Consequently, it is of limited use in estimating the value of closely held firms."

In his rebuttal testimony, Mr. Frazier fails to offer any rebuttal of Dr. Bajaj's criticism of the IPO approach. Mr. Frazier's support for the IPO approach consists only of his

reference to a series of studies undertaken by Shannon Pratt, Chairman of Willamette Management Associates, Inc., a national business valuation firm (the Willamette studies). Without explaining the basis of his testimony, Mr. Frazier's opinion is: "[T]he evidence from the Willamette study was quite compelling and offered strong support for the hypothesis that the fair market values of minority interests in privately held companies were and should be greatly discounted from their publicly-traded counterparts."

By contrast, in his rebuttal testimony, Dr. Bajaj offers a compelling criticism of both the Willamette studies and another series of studies undertaken by John D. Emory, vice president of appraisal services at Robert W. Baird and Co., a regional investment banking firm.[33] He concludes that the latest study conducted by Mr. Emory is biased because it does not adequately take into account the highest sale prices in pre-IPO transactions, and he criticizes the Willamette studies for not disclosing enough data to reveal whether they suffer from a similar bias. Dr. Bajaj has convinced us to reject as unreliable Mr. Frazier's opinion to the extent it is based on the IPO approach. We shall proceed to consider Mr. Frazier's restricted stock analysis and Dr. Bajaj's private placement analysis.

---

[33] Mr. Frazier relied on Mr. Emory's studies in the 1996 HFBE appraisal report but makes no mention of those studies in either his direct testimony or his rebuttal testimony.

### 3. Mr. Frazier's Restricted Stock Analysis

Mr. Frazier reviews four studies under the restricted stock approach[34] and then attempts to infer an appropriate marketability discount by "placing" MIL within the range of observed discounts in those studies and the Willamette studies, on the basis of certain characteristics of MIL (revenue, income, and NAV) and the gifted interest (size of the interest, expressed both as a percentage of MIL and as a dollar amount). The results of that attempt are set forth in Table 31 of the report constituting Mr. Frazier's direct testimony (Table 31). Based on data from the five studies, Mr. Frazier identifies 10 hypothetical discount levels for the gifted interest (some expressed as a specific percentage, e.g., "33.6%", and some expressed as being greater or less than a specific percentage, e.g., ">35%"). Six of the hypothetical discounts were greater than 35 percent and four were less than 35 percent. He states:

---

[34] Mr. Frazier reviews the following studies (the restricted stock studies):

1. Securities and Exchange Commission, Discounts Involved in Purchases of Common Stock (1966-1969), H.R. Doc. No. 64, Part 5, at 2444-2456 (1971).

2. Silber, "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," Financial Analysts Journal, July-August 1991, at 60.

3. A study only described as "The Standard Research Consultants (SRC) Study".

4. Hertzel & Smith, "Market Discounts and Shareholder Gains for Placing Equity Privately," 48 J. Fin. 459 (1993).

"Based on these studies alone, we concluded that the discount applicable to the Partnership's block should approximate 35 percent."

We find several flaws in Mr. Frazier's analysis. For example, Table 31 indicates that MIL's projected revenue of $681,000 is consistent with a discount of 51.9 percent based on data from the Willamette studies. The Willamette studies are IPO studies rather than restricted stock studies, and they do not, so far as we can tell from Mr. Frazier's testimony, analyze firm revenues.[35] Table 31 also indicates that one can infer a discount from the "Hertzel and Smith" study based on the proportional size of the offering, although Mr. Frazier gives no indication that that study drew any correlations between that variable and the level of discount. Furthermore, under the heading "Size of Block as % Total Outstanding" in Table 31, the entry corresponding to MIL is "1.0%", when in fact each half of the gifted interest represents a greater than 40-percent interest with respect to MIL. Similarly, although there is no entry in Table 31 for the dollar size of the gifted interest, it is evident that the ">35%" discount inferred from that variable in Table 31 is based on the same mischaracterization of each half of

---

[35] Indeed, under the heading "Revenues" in Table 31 of Mr. Frazier's direct report, the entry corresponding to "Willamette" is "NA".

the gifted interest as a 1-percent interest in MIL.[36]  In light of those numerous defects, we give little weight to Mr. Frazier's restricted stock analysis.

###### 4. Dr. Bajaj's Private Placement Analysis

###### a. Comparison of Registered and Unregistered Private Placements

Dr. Bajaj believes that the discounts observed in restricted stock studies are attributable in part to factors other than impaired marketability.[37]  In support of his position, Dr. Bajaj analyzes data from studies (including his own unpublished study)[38] involving both registered private placements and unregistered private placements (the private placement studies). He observes that, if discounts found in unregistered (restricted) private placements are attributable solely to impaired marketability, then there should be no discounts associated with

---

[36]  Specifically, one restricted stock study, the Silber study, found that the average dollar size of private placements with discounts in excess of 35 percent was $2.7 million, while the average dollar size of private placements with discounts less than 35 percent was $5.8 million.  Even taking into account Mr. Frazier's suggested minority interest discount of 22 percent, the "dollar size" of each half of the gifted interest was approximately $5.7 million.  That would indicate that, based on the Silber study, a discount of less than 35 percent would be appropriate for each half of the gifted interest.

[37]  We note that such other factors should not include the purchaser's minority ownership position, if applicable; presumably, a minority interest discount is already reflected in the market price of a share of the issuer.

[38]  Other than his own study, he refers to the Wruck study, supra note 30, and the Hertzel & Smith study, supra note 34.

registered private placements (i.e., because such shares can be sold in the public market). However, the results of the private placement studies indicate that even registered private placement shares are issued at a discount, although such discounts tend to be lower than those observed in unregistered private placements. Dr. Bajaj explains that phenomenon by positing that privately placed shares, whether registered or unregistered, tend to be issued to purchasers of large blocks of stock who demand discounts to compensate them for assessment costs and anticipated monitoring costs. He states: "The discount offered to buyers is a compensation for the cost of assessing the quality of the firm and for the anticipated costs of monitoring the future decisions of its managers."

>           b.    Refinement of Registered/Unregistered
>                 Discount Differential

Dr. Bajaj further contends that the additional discount typical of unregistered private placements (as compared to registered private placements) is not entirely attributable to the fact that unregistered shares, unlike registered shares, generally cannot be sold in the public market. Rather, he contends that such differential is attributable in part to higher assessment and monitoring costs incurred in unregistered private placements as compared to registered private placements. In support of his theory, Dr. Bajaj suggests four factors that might have a correlative relationship to assessment and monitoring

costs and, by extension, to private placement discounts: (1) the size of the private placement relative to the issuer's total shares outstanding, (2) the volatility of the issuer's recent economic performance, (3) the overall financial health of the issuer, and (4) the size of the private placement in terms of total proceeds. Dr. Bajaj posits that the additional discount observed in unregistered issues could be attributable solely to impaired marketability only if those four additional factors were present in equal measure among both registered and unregistered private placements.

Dr. Bajaj analyzes the effects of the four additional factors listed above and concludes that the first three (but not the fourth) of those factors are systematically related to the level of private placement discounts. Specifically, he concludes that, relatively speaking, a high ratio of privately placed shares to total shares of the issuer, high issuer volatility, and weak financial health of the issuer tend to be indicative of higher discounts. Dr. Bajaj then demonstrates that, as compared to registered private placements, unregistered private placements tend to involve a higher percentage of the issuer's total shares, higher issuer volatility, and financially weaker issuers. That being the case, Dr. Bajaj concludes that the registered-unregistered private placement discount differential must be attributable in part to those three factors rather than just

impaired marketability. In other words, the additional discount typical of unregistered private placements as compared to registered private placements does not represent solely compensation for impaired marketability but represents in part compensation for the relatively higher assessment and anticipated monitoring costs normally associated with unregistered issues.

Having concluded that factors unrelated to impaired marketability play a variable role in the total discounts observed in private placement transactions, Dr. Bajaj then attempts to isolate the effect that impaired marketability has on such total discounts. To that end, he adds a variable for stock registration to variables representing the three additional correlative factors and uses the statistical technique of multivariate regression to determine the effect of each such variable on the discounts observed in his sample of private placements. He concludes from that analysis that, over the 1990 to 1995 period of his study, a private issue that was registered (thereby allowing purchasers to immediately resell in the public market) would have required a discount that was 7.23 percentage points less than an otherwise identical issue (in terms of the three additional correlative factors) that was unregistered.

c. Further Adjustments

Dr. Bajaj considers and rejects any additional adjustment (discount) on account of the long-term impaired marketability of

an assignee interest in MIL[39] as compared to the limited impaired

marketability of restricted shares of stock.  His rejection is

based primarily on his opinion, supported by the economic

analysis of others,[40] that the level of discount does not

continue to increase with the time period of impaired

marketability, because investors with long-term horizons would

provide a natural clientele for holding illiquid assets and would

compete to purchase all or a portion of the gifted interest.

      d.   <u>Application to MIL</u>

Dr. Bajaj concludes:

> Considering the available data, the Partnership's
> holdings and history, and the marketability discount of
> 7.23% suggested by my regression analysis involving a
> broad range of economic sectors, I conclude that a
> marketability discount of 7% [rounded from 7.23
> percent] is appropriate for all the assets held by MIL
> when valuing the subject interest.  * * *

      5.   <u>Determination of the Marketability Discount</u>

      a.   <u>Discussion</u>

Mr. Frazier, in his testimony in rebuttal to Dr. Bajaj,

criticizes Dr. Bajaj for focusing narrowly on "liquidity" at the

expense of other factors that contribute to a lack of

marketability.  Mr. Frazier states that "[t]he impediments to

value associated with inability to easily sell an interest in a

---

[39]  Both experts operate under the assumption that there will not be a ready market for assignee interests in family limited partnerships during the remainder of MIL's 30-year term.

[40]  Amihud & Mendelson, "Asset Pricing and Bid-Ask Spread," 17 J. Fin. Econ. 223 (1986).

closely-held entity go well beyond the narrowly defined 'liquidity costs' Dr. Bajaj has isolated in his analysis" and that "the [marketability] discount is caused not by just 'liquidity' but the other negative characteristics that attend securities issued by small closely-held entities."

Dr. Bajaj has indeed been helpful in focusing our attention (and Mr. Frazier's attention) on the distinction between illiquidity and other factors (e.g., assessment and monitoring costs) that contribute to private placement discounts. However, his apparent confusion regarding the nature of the discount for lack of marketability (i.e., whether such discount can be explained purely in terms of illiquidity or whether other factors may be involved) is troubling. In his direct testimony, Dr. Bajaj is fairly clear that assessment and monitoring costs associated with private placements are outside the realm of the marketability discount. In his rebuttal testimony, however, he indicates that such costs may contribute to the marketability discount for a closely held entity. That leads us to question whether other "negative characteristics" (in the words of Mr. Frazier) associated with closely held entities may contribute to the appropriate marketability discount for an assignee interest in MIL. Therefore, while we are impressed by portions of Dr. Bajaj's analysis, he has not convinced us that the

appropriate marketability discount in this case can be inferred from the illiquidity cost associated with private placements.

Although we reject Dr. Bajaj's quantification of the appropriate marketability discount in this case, we look to the data from his private placement study for two reasons. First, we believe that, given MIL's status as an investment company,[41] what Dr. Bajaj refers to in the context of private placements as assessment and monitoring costs would be relatively low in the case of a sale of an interest in MIL. That belief, coupled with Dr. Bajaj's persuasive argument that such costs are relatively high in unregistered private placements, leads us to conclude that a sample consisting entirely of unregistered private placements would be inappropriately skewed. Second, only Dr. Bajaj's study (and not the other private placement studies on which he relies) covers the period (1990-1995) immediately preceding the valuation date.

In Table 10 of the report constituting his direct testimony, Dr. Bajaj separates the 88 private placements in his sample into three groups according to the level of discounts (i.e., the 29 lowest discounts, the middle 29 discounts, and the 30 highest discounts). Presumably, the "low" category is dominated by

_____

[41] On the valuation date, 65 percent of MIL's assets consisted of marketable securities and an additional 30 percent consisted of real estate limited partnership interests, subject to well-known and relatively routine appraisal techniques (such as cashflow analysis or market multiple methods).

registered private placements which, unlike an assignee interest in MIL, did not suffer from impaired marketability.  Similarly, it is likely that the "high" category is dominated by unregistered private placements which, unlike the sale of an interest in an investment company, entailed relatively high assessment and monitoring costs.  Accordingly, we look to the "middle" group of private placements in Dr. Bajaj's sample in determining the appropriate marketability discount for an assignee interest in MIL.  The average discount of that group of private placements was 20.36 percent.[42]  We are not persuaded that we can refine that figure any more to incorporate characteristics specific to MIL.

### b.  Conclusion

We find that a discount for lack of marketability of 20 percent (rounded from 20.36 percent) is appropriate in determining the fair market value of each half of the gifted interest.

### E.  Conclusion

We conclude that the fair market value of each half of the gifted interest is $4,941,916, determined as follows:[43]

---

[42]  That discount is consistent with the average discount (20.14 percent) observed in the Hertzel & Smith private placement study, supra note 34, the study (other than his own) primarily relied upon by Dr. Bajaj.

[43]  For ease of computation, we determine the fair market value of a 1-percent interest.

| | |
|---|---:|
| Total NAV | $17,673,760 |
| Less: Class A preference | (20,000) |
| "Net" NAV | 17,653,760 |
| 1 percent of net NAV | 176,538 |
| Less: 15-percent minority interest discount | (26,481) |
| Marketable value | 150,057 |
| Less: 20-percent marketability discount | (30,011) |
| FMV of 1-percent interest | 120,046 |
| FMV of 41.16684918-percent interest | 4,941,916 |

## VI. Charitable Contribution Deduction for Transfer to CFT

### A. Introduction

The gift tax is imposed on the value of what the donor transfers, not what the donee receives. Shepherd v. Commissioner, 115 T.C. 376, 385 (2000) (citing, inter alia, Robinette v. Helvering, 318 U.S. 184, 186 (1943)), affd. 283 F.3d 1258 (11th Cir. 2002). In essence, petitioners contend that because (1) they transferred to CFT a portion of the gifted interest corresponding to the excess of the fair market value of that interest over $7,044,933, and (2) we have determined the fair market value of the gifted interest to be $9,883,832, it follows from the maxim beginning this paragraph that they are entitled to a charitable contribution deduction in the amount of $2,838,899 for their gift to CFT. Because the assignment agreement does not equate the term "fair market value" with the term "fair market value as finally determined for Federal gift tax purposes," petitioners' argument must fail.

B.    The Assignment Agreement

By way of the assignment agreement, petitioners transferred to CFT the right to a portion of the gifted interest.  That portion was not expressed as a specific fraction of the gifted interest (e.g., one-twentieth), nor did petitioners transfer to CFT a specific assignee interest in MIL (e.g., a 3-percent assignee interest).  Rather, CFT was to receive a fraction of the gifted interest to be determined pursuant to the formula clause contained in the assignment agreement.  The formula clause provides that CFT is to receive that portion of the gifted interest having a fair market value equal to the excess of (1) the total fair market value of the gifted interest, over (2) $7,044,933.  The formula clause is not self-effectuating, and the assignment agreement leaves to the assignees the task of (1) determining the fair market value of the gifted interest and (2) plugging that value into the formula clause to determine the fraction of the gifted interest passing to CFT.

Petitioners argue that, because the assignment agreement defines fair market value in a manner that closely tracks the definition of fair market value for Federal gift tax purposes, see sec. 25.2512-1, Gift Tax Regs., the assignment agreement effects a transfer to CFT of a portion of the gifted interest determinable only by reference to the fair market value of that interest as finally determined for Federal gift tax purposes.  We

do not believe that the language of the assignment agreement

supports petitioners' argument.  The assignment agreement

provides a formula to determine not only CFT's fraction of the

gifted interest but also the symphony's and the children's

(including their trusts') fractions.[44]  Each of the assignees had

the right to a fraction of the gifted interest based on the value

of that interest as determined under Federal gift tax valuation

principles.  If the assignees did not agree on that value, then

such value would be determined (again based on Federal gift tax

valuation principles) by an arbitrator pursuant to the binding

arbitration procedure set forth in the partnership agreement.

There is simply no provision in the assignment agreement that

contemplates the allocation of the gifted interest among the

assignees based on some fixed value that might not be determined

---

[44]  If $f$ equals the fair market value of the gifted interest
(determined by the assignees (or an arbitrator) based on Federal
gift tax valuation principles), and the gifted interest is shown
as the 82.33369836 percent class B assignee interest in MIL
transferred by petitioners, then, assuming $f$ is equal to or
greater than $7,044,933, the products of the following formulas
show the percentage assignee interests apportioned to the
children (including the trusts), the symphony, and CFT, expressed
as $x_1$, $x_2$, and $x_3$, respectively:

$$\frac{\$6,910,933}{f} \times 82.33369836\% = x_1$$

$$\frac{\$7,044,933 - 6,910,933}{f} \times 82.33369836\% = x_2$$

$$\frac{f - \$7,044,933}{f} \times 82.33369836\% = x_3$$

for several years.  Rather, the assignment agreement contemplates
the allocation of the gifted interest based on the assignees'
best estimation of that value.  Moreover, each of the assignees'
percentage interests was determined exactly as contemplated in
the assignment agreement (without recourse to arbitration), and
none can complain that they got any less or more than petitioners
intended them to get.[45]  Had petitioners provided that each donee
had an enforceable right to a fraction of the gifted interest
determined with reference to the fair market value of the gifted
interest as finally determined for Federal gift tax purposes,[46]
we might have reached a different result.  However, that is not
what the assignment agreement provides.

---

[45]  We suppose that, at least in theory, there might be a
difference between (1) petitioners' and the assignees'
expectation on Jan. 12, 1996 (the valuation date), regarding the
value of the portion of the gifted interest passing to CFT and
(2) the value of that portion as subsequently determined by the
assignees.  However, no one has suggested how to value the first
quantity or that, on the facts before us, the difference would be
significant.

[46]  See, e.g., sec. 1.664-2(a)(1)(iii), Income Tax Regs.
(providing that a sum certain may be expressed as a fraction or
percentage of the value of property "as finally determined for
Federal tax purposes", but requiring that actual adjusting
payments be made if such finally determined fair market value
differs from the initially determined value); sec. 20.2055-
2(e)(2)(vi)(a), Estate Tax Regs. (similar); sec. 25.2702-
3(b)(1)(ii)(B), Gift Tax Regs. (similar); Rev. Proc. 64-19, 1964-
1 C.B. 682 (discussing conditions under which the Federal estate
tax marital deduction may be allowed where, under the terms of a
will or trust, an executor or trustee is empowered to satisfy a
pecuniary bequest or transfer in trust to a decedent's surviving
spouse with assets at their value as finally determined for
Federal estate tax purposes).

Of course, the assignees' determination of the fair market value of the gifted interest, while binding among themselves for purposes of determining their respective assignee interests, has no bearing on our determination of the Federal gift tax value of the assignee interests so allocated.  Since we find that the fair market value of a 1-percent assignee interest in MIL on the valuation date was $120,046, the following table expresses the fair market values of the percentage assignee interests passing to the various assignees:

| Assignee | Percentage Assignee Interest | Fair Market Value |
|---|---|---|
| Children and trusts | 77.21280956 | $9,269,089 |
| Symphony | 1.49712307 | 179,724 |
| CFT | 3.62376573 | 435,019 |
| | | 9,883,832 |

C.   Conclusion

We find that the fair market value of the property right transferred by petitioners to CFT was $435,019.[47]  Taking into

---

[47]  The rule is well established that we may approve a deficiency on the basis of reasons other than those relied on by the Commissioner.  See Wilkes-Barre Carriage Co. v. Commissioner, 39 T.C. 839, 845 (1963) (and cases cited therein), affd. 332 F.2d 421 (2d Cir. 1964).  Because our conclusion that the valuation clause of the assignment agreement does not achieve the claimed "tax neutralization" effect is based on the language of the assignment agreement, we need not address respondent's arguments that (1) the formula clause is against public policy, and (2) the transaction should be recast as transfers of cash by petitioners to CFT and the symphony under an integrated transaction theory. We note that the application of respondent's integrated transaction theory would result in an initial increase in the amount of petitioners' aggregate taxable gift of only $90,011 (less than 1 percent), which would be partially offset by the resulting increase in the gift tax liability that the noncharitable donees assumed under the assignment agreement.

account annual exclusions, see sections 2503(b) and 2524, each petitioner is entitled to a charitable contribution deduction under section 2522 of $207,510 resulting from the transfer to CFT.[48]

## VII.  Effect of Children's Agreement To Pay Estate Tax Liability

### A.  Introduction

Recently, in Ripley v. Commissioner, 105 T.C. 358, 369 (1995), revd. on another issue 103 F.3d 332 (4th Cir. 1996), we described the nature of a net gift as follows:

> Where a "net gift" is made, the donor and donee agree that the donee will bear the burden of the gift tax. The value of the property transferred is reduced by the amount of the gift tax paid by the donee, resulting in the net amount transferred by gift, or the "net gift". The IRS has provided an algebraic formula for determining the amount of gift tax owed on a "net gift" in Rev. Rul. 75-72, 1975-1 C.B. 310.  It is important to keep in mind that once the "net gift" is calculated, the full amount of the gift tax is paid on the "net gift".
>
>     When a "net gift" is made, a portion of the property is transferred by gift and the remaining portion is transferred by sale.  * * *

The net gift rationale flows from the basic premise that the gift tax applies to transfers of property only to the extent that the value of the property transferred exceeds the value in money or

---

[48]  We note that, under our analysis, the assignee interest received by the symphony is worth more than $134,000. Nevertheless, we do not believe that petitioners have claimed any increased charitable contribution deduction under sec. 2522 on account of the transfer to the symphony.  If we are mistaken on that point, petitioners can bring that to our attention (or perhaps petitioners and respondent can deal with it in the Rule 155 computation).

money's worth of any consideration received in exchange therefor. See sec. 2512(b); sec. 25.2512-8, Gift Tax Regs.

Petitioners each reported his or her transfer of one-half of the gifted interest as a net gift. Each treated as sales proceeds (consideration received) (1) the amount of Federal and State gift taxes that he or she calculated were to be paid by the children (the gift tax amount) and (2) an amount described on brief as the "mortality-adjusted present value" (mortality-adjusted present value) of the children's contingent obligation to pay the additional estate tax that would have been incurred on account of section 2035(c) (the 2035 tax) if that petitioner had died within 3 years of the date of the gift. Petitioners describe their computation of the mortality-adjusted present value as follows:

> Petitioners * * * estimated the amount of estate tax that would be owed under I.R.C. § 2035(b) based on an expected 55% marginal estate tax rate. Then Petitioners adjusted that amount to present value at the applicable discount rate under I.R.C. § 7520 for January 1996, with further adjustment for the possibility that they would survive each year of the three-year period with no estate tax actually being owed. The probability of death in each of the ensuing three years was calculated, and then the probability-weighted tax amounts were discounted to present value at the required interest rate. All calculations were made, as required under I.R.C. § 7520, by reference to Petitioners' ages as of their nearest birthdays, the applicable interest rate under I.R.C. § 7520 for January, 1996, and mortality factors provided by Table 80CNSMT (as found in Respondent's Pub. 1457, "Actuarial Values, Alpha Volume").

Petitioners computed the mortality-adjusted present values of the above described obligations as being $149,813 and $139,348 with respect to Mr. and Mrs. McCord, respectively.

Respondent does not take issue with petitioners' treatment of the gift tax amounts as sale proceeds. However, he disputes petitioners' treatment of the mortality-adjusted present values as sale proceeds, primarily on the grounds that those amounts are too speculative to be taken into account. Respondent cites Armstrong Trust v. United States, 132 F. Supp. 2d 421 (W.D. Va. 2001), affd. sub nom. Estate of Armstrong v. United States, 277 F.3d 490 (4th Cir. 2002). In Armstrong Trust, supra, a gift was made and, because of (current) section 2035(b), the donees were subject to a potential liability, as transferees, for estate taxes. See sec. 6324(a)(2). Plaintiffs argued that liens or encumbrances were created on the gift by reason of the potential estate tax liability assumed by the donees, thereby reducing the value of the gift. Id., 132 F. Supp. 2d at 430. The District Court found that the possibility of future estate tax liability was too speculative to reduce the value of the gift.

Relying on an opinion of the United States Court of Claims, Murray v. United States, 231 Ct. Cl. 481, 687 F.2d 386 (1982), the Court of Appeals for the Fourth Circuit affirmed the District Court's decision in Armstrong Trust, also on the basis that the donees' potential liability for the donor's estate tax was too

speculative to reduce the value of the gifts.  Estate of

Armstrong v. United States, supra at 498.  It was of no moment to

the Court of Appeals that the donor had in fact died within 3

years of the gift, thus causing a 2035 tax to be due, or that the

plaintiffs apparently had produced expert calculations of an

amount similar to the mortality-adjusted present value at issue

in this case.  The Court of Appeals said:

> The litigation attempts of the Estate and the Trust to
> quantify through expert calculations the value of
> potential estate taxes at the time of the transfers is
> irrelevant.  What is relevant is that the children's
> obligation to pay any estate taxes was then "highly
> conjectural," Murray, 687 F.2d at 394, and so provides
> no ground for applying net gift principles.  [Id.]

In Murray v. United States, supra, the donor had made gifts

in trust pursuant to an instrument that obligated the trustees to

pay, among other debts, the donor's estate and death taxes

liabilities.  The plaintiffs (executors of the donor's estate)

argued that the obligation to pay the donor's estate and death

taxes rendered the gifts without value when made.  The Court of

Claims disagreed, finding that the obligation to pay estate and

death taxes "was not * * * susceptible to valuation at the date

of the gifts because the economic burden of paying these taxes

was then unknown."  Id., 687 F.2d at 394.  The Court questioned

whether it was even possible to approximate the value of the

trustee's obligation to pay the donor's estate and death tax

liabilities:

the amount of estate and death taxes payable from the *
* * [trusts] was highly conjectural.  If Oliver lived
until May 1971, the value of the 1968 Family Trust
would no longer have been included in his estate as a
gift in contemplation of death under section 2035,
significantly reducing his estate tax liability.
Moreover, had he lived for several more years, the size
of his estate would have continued to diminish, leaving
the 1970 Family Trusts with an ever-decreasing estate
tax obligation.  * * *

Id. at 394-395.  The Court of Claims concluded:  "Thus,

plaintiffs' inability to reasonably estimate the amount of tax,

if any, to be paid from the * * * [trusts] made it proper to

compute the gift tax on the basis of the full value of the trust

assets.  Robinette v. Helvering, 318 U.S. 184, 188-89 (1943)."

Id. at 395.[49]

B.  Discussion

The specific question before us is whether to treat as part

of the sale proceeds (consideration) received by each petitioner

on the transfer of the gifted interest any amount on account of

the children's obligation pursuant to the assignment agreement to

pay the 2035 tax that would be occasioned by the death of that

petitioner within 3 years of the valuation date.  We have not

faced that specific question before.[50]  Neither Armstrong Trust

_____

[49]  In Robinette v. Helvering, 318 U.S. 184, 188-189 (1943),
the Supreme Court held that, in computing the value of a gift of
a remainder interest in property, the value (as an offset) of the
donor's contingent reversionary remainder interest was to be
disregarded because there was no recognized method of determining
its value.

[50]  Nevertheless, in Estate of Armstrong v. Commissioner,
(continued...)

v. United States, supra, nor Murray v. United States, supra, is

binding on us, and, indeed, the facts of both cases are somewhat

different from the facts before us today.  Armstrong Trust did

not involve a specific assumption of the potential 2035 tax as a

condition of the underlying gift (as is the case here); rather,

the donees were statutorily liable for any 2035 tax under section

6324(a)(2).  In Murray, unlike the instant case, the obligation

was not limited to the "gross-up" tax of (original) section

2035(c), with its preordained inclusion amount and accompanying

3-year window of inclusion (indeed, that provision and the

unified gift and estate tax system had yet to be enacted).

Nevertheless, we agree with what we believe to be the basis of

those two opinions, i.e., that, in advance of the death of a

person, no recognized method exists for approximating the burden

of the estate tax with a sufficient degree of certitude to be

effective for Federal gift tax purposes.  See also Estate of

Armstrong v. Commissioner, 119 T.C. 220, 230 (2002).

Petitioners' computation of the mortality-adjusted present

value of the children's obligation to pay the 2035 tax does

---

[50](...continued)
119 T.C. 220, 230 (2002) (addressing certain Federal estate tax
questions with respect to the same gifts in question in Armstrong
Trust v. United States, 132 F. Supp. 2d 421 (W.D. Va. 2001),
affd. sub nom. Estate of Armstrong v. United States, 277 F.3d 490
(4th Cir. 2001)), we said:  "The donee children's mere
conditional promise to pay certain additional gift taxes that
decedent might be determined to owe does not reduce the amount of
decedent's gift taxes included in the gross estate under section
2035(c)."

nothing more than demonstrate that, if one assumes a fixed dollar amount to be paid, contingent on a person of an assumed age not surviving a 3-year period, one can use mortality tables and interest assumptions to calculate the amount that (without any loading charge) an insurance company might demand to bear the risk that the assumed amount has to be paid.  However, the dollar amount of a potential liability to pay the 2035 tax is by no means fixed; rather, such amount depends on factors that are subject to change, including estate tax rates and exemption amounts (not to mention the continued existence of the estate tax itself[51]).  For that reason alone, we conclude that petitioners are not entitled to treat the mortality-adjusted present values as sale proceeds (consideration received) for purposes of determining the amounts of their respective gifts at issue.[52] See Robinette v. Helvering, 318 U.S. 184, 188-189 (1943) (donor's reversionary interest, contingent not only on donor outliving

_____

[51]  See Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. 107-16, secs. 501(a), 901(a), 115 Stat. 38, 69, 150 (repealing the estate tax with respect to decedents dying after Dec. 31, 2009, and reinstating same with respect to decedents dying after Dec. 31, 2010).

[52]   We recognize that, in Harrison v. Commissioner, 17 T.C. 1350, 1354-1355 (1952), we reduced the amount of a gift of a trust remainder by the present value of the trustee's obligation, under the terms of the trust agreement, to pay the settlor-life beneficiary's income tax liability attributable to the trust's income for the remainder of her life:  "Federal income taxes have become a permanent and growing part of our economy, and there is no likelihood that such taxes will not continue to be imposed throughout the life expectancy of petitioner."  We do not have occasion today to reconsider that opinion.

30-year old daughter, but also on the failure of any issue of the daughter to attain the age of 21 years, is disregarded as an offset in determining the value of the gift; actuarial science cannot establish the probability of whether the daughter would marry and have children).

Our conclusion is further buttressed by broader considerations of Federal gift tax law.  Under the "estate depletion" theory of the gift tax, it is the benefit to the donor in money or money's worth, rather than the detriment to the donee, that determines the existence and amount of any consideration offset (sale proceeds) in the context of an otherwise gratuitous transfer.  See Commissioner v. Wemyss, 324 U.S. 303, 307-308 (1945); 2 Paul, Federal Estate and Gift Taxation 1114-1115 (1942).  When a donee agrees to pay the gift tax liability resulting from a gift, the benefit to the donor in money or money's worth is readily apparent and ascertainable, since the donor is relieved of an immediate and definite liability to pay such tax.  If that donee further agrees to pay the potential 2035 tax that may result from the gift, then any benefit in money or money's worth from the arrangement arguably would accrue to the benefit of the donor's estate (and the beneficiaries thereof) rather than the donor.  The donor in that situation might receive peace of mind, but that is not the type of tangible benefit required to invoke net gift principles.

C.  Conclusion

Because petitioners have failed to show that their computation of the value of the children's obligation to pay any 2035 tax is reliable, we do not accept it as establishing any proceeds received by petitioners and reducing the value of the net gifts made by them.

VIII.  Conclusion

The fair market value of the gifted interest on the date of the gift was $9,883,832 ($4,941,916 for each half thereof). Petitioners are entitled to an aggregate charitable contribution deduction under section 2522 for the transfer to CFT in the amount of $415,019 ($207,510 apiece).

To reflect the foregoing,

Decision will be

entered under Rule 155.

Reviewed by the Court.

WELLS, COHEN, SWIFT, GERBER, COLVIN, GALE, and THORNTON, JJ., agree with this majority opinion.

SWIFT, <u>J</u>., concurring:  The majority opinion adopts an interpretation of the "fair market value" language of the formula clause that recognizes the sophistication of the tax planning before us and that gives significance to the failure of that formula clause to use commonly recognized language in the estate planning profession under which--had it been intended--a fair market value determination (and an allocation between the donees of the gifted interest based thereon) "as finally determined for Federal gift tax purposes" would have been made explicit.  In my opinion, the failure of the formula clause to reflect such well-recognized language belies petitioners' claim that such language, interpretation, and result were intended and now should be inferred.

Under the majority's interpretation of the formula clause, the abuse potential inherent therein is essentially negated.

If, however, petitioners' interpretation of the formula clause were adopted, under which petitioners claim an increasd charitable deduction equal to all excess value of the gifted interest over $7,044,093, as finally determined for Federal gift tax purposes, without property representing such excess value actually passing to charity, the long-standing "reasonable probability" and "public policy" doctrines applicable generally to gifts would become applicable.  See, e.g., <u>Hamm v. Commissioner</u>, T.C. Memo. 1961-347, affd. 325 F.2d 934 (8th Cir. 1963), applying the reasonable probability standard to the

question of whether a charitable donee will ever receive gifted property; Commissioner v. Procter, 142 F.2d 824 (4th Cir. 1944), applying public policy principles to the question of whether abusive valuation or adjustment clauses are to be respected.

With regard to Judge Foley's criticism of these doctrines, see dissenting op. pp. 94-95, 107-108, I would suggest that the reasonable probability and public policy doctrines should not be confined to stale factual situations involved in old cases. To the contrary, these doctrines live and breathe and have a life that should be broad and flexible enough to apply to contemporary and overly aggressive gift and estate tax planning (such as that involved herein)--particularly where charity is involved.

With regard further to the nature or extent of the gift to charity involved herein, I would emphasize that not "all" of petitioners' MIL partnership interest was transferred. Respondent argues that "all" of petitioners' MIL partnership interest was transferred, but petitioners contend otherwise, and the majority opinion concludes that something less than all of petitioners' interest in the MIL partnership was transferred (namely, only an "assignee" interest was transferred). See majority op. pp. 19-24. In light of the majority's conclusion in that regard, had respondent argued in the alternative that the "partial interest" gift rules of section 2522(c)(2) and section 25.2522(c)-3(c), Gift Tax Regs., were applicable to petitioners'

gift to charity, it would appear that petitioners' claimed charitable deduction herein would have been completely disallowable.  See the analysis below relating to the deductibility of gifts to charity of partial interests.

The Gift

Petitioners formed MIL as a Texas family limited partnership and made gifts of a portion of their interests therein by way of an assignment agreement and a formula clause which, according to petitioners and the majority opinion, transferred only assignee interests in MIL to four levels of donees, generally as follows:

> First and Second Level (Noncharitable) Donees:  Trusts for the benefit of the donors' four children (first level donees) to receive portions of the gifted interest and outright gifts to the donors' four children (second level donees) with an aggregate fair market value on the valuation date up to $6,910,933;

> Third Level Donee:  If the fair market value of the gifted interest exceeds $6,910,933, Symphony, a charitable donee, to receive such excess up to a maximum value of $134,000;

> Fourth Level Donee:  If the fair market value of the gifted interest exceeds $7,044,933 ($6,910,933 plus $134,000), CFT, also a charitable donee, to receive such excess without limit.

Focusing on the gift to the fourth level charitable donee (the gift to CFT), petitioners themselves allege (in order to beef up the valuation discounts they seek) and the majority opinion finds, majority op. pp. 19-24, that the gifted MIL partnership interest transferred to CFT included only certain

"economic rights" with regard to the gifted interest and did not consist of all of the donors' rights as limited partners in that particular limited partnership interest. Upon petitioners' transfer and upon CFT's receipt of the gifted interest in the MIL partnership, petitioners retained, and CFT never received, the following rights associated with petitioners' interest in MIL (references are to the MIL amended partnership agreement):

(1) The right to vote on MIL partnership matters (section 3.10);

(2) The right to redeem the MIL partnership interest (section 9.02(b));

(3) The right to inspect financial and other pertinent information relating to MIL (section 3.09(d)(i)-(v));

(4) The right to access any properties or assets owned by MIL (section 3.09(d)(vi)); and

(5) The right to veto early liquidation of MIL, unless such liquidation is required by State law (section 10.01).

Under section 7.02 of the Texas Revised Limited Partnership Act, a partnership agreement may, but is not required to, limit the partnership rights that may be transferred when a partner transfers or assigns an interest in a partnership. In this case, petitioners made their retention of the above rights (and the nonreceipt thereof by CFT) explicit by the terms of the MIL partnership agreement that they adopted. Section 8.03 of the MIL partnership agreement, discussing the transfer of a limited

partnership interest to an assignee, is set forth, in part,

below:

> [A]n Assignee shall be entitled only to allocations of
> Profits and Losses * * * and distributions * * * which
> are attributable to the Assigned Partnership Interests
> held by the Assignee and shall not be entitled to
> exercise any Powers of Management nor otherwise
> participate in the management of the Partnership nor
> the control of its business and affairs. * * *

As explained, the above limitations on the charitable gift

transferred by petitioners to CFT are the basis for petitioners'

claimed characterization and valuation of the gift to CFT as an

assignee interest in MIL, as distinguished from an MIL

partnership interest, and (as petitioners themselves contend)

they would appear to constitute substantive and significant

limitations.

## Deductibility of Gifts to Charity of Partial Interests

Generally, and apart from certain specified statutory

exceptions noted below, where less than donors' entire interests

in property are transferred to charity, the charitable

contributions--for Federal gift tax purposes, as well as for

Federal income and estate tax purposes--are to be treated as

partial interests and any claimed gift, income, and estate tax

charitable deductions relating thereto are to be disallowed.  See

secs. 2522(c)(2) (gift tax disallowance), 170(f)(3) (income tax

disallowance), 2055(e)(2) (estate tax disallowance).

Set forth below, in part, is the statutory language of section 2522(c)(2) that, for Federal gift tax purposes, generally disallows charitable deductions for gifts to charity of partial interests:

> SEC. 2522(c). Disallowance of Deductions in Certain Cases.--
>
> * * * * * * *
>
> (2) Where a donor transfers an interest in property (other than an interest described in section 170(f)(3)(B)) to a person, or for a use, described in subsection (a) or (b) [qualified charities] and an interest in the same property is retained by the donor, or is transferred or has been transferred (for less than an adequate and full consideration in money or money's worth) from the donor to a person, or for a use, not described in subsection (a) or (b), no deduction shall be allowed under this section for the interest which is, or has been transferred to the person, or for the use, described in subsection (a) or (b) * * *

Treasury regulations applicable to the above statutory provisions provide examples of charitable gifts of partial interests subject to the above disallowance rule.  Section 1.170A-7(d), Example (1), Income Tax Regs., treats as a partial interest a gift to charity of the rent-free use of one floor of an office building where the donor owns the entire office building.

Section 20.2055-2(e)(2)(i), Estate Tax Regs., classifies as a partial interest a gift to charity of a reversionary interest in an office building where the decedent transfers to his wife a

life estate in the office building and where the decedent's wife is still living when the reversionary interest passes to charity.

Section 25.2522(c)-3(c)(1)(i), Example (3), Gift Tax Regs., treats as a partial interest a gift to charity of the right to rental income from real property where the remaining interest in the property is transferred to a noncharitable donee.

Other authorities recognize and discuss the above general rule under which charitable deductions are disallowed for gifts to charity of partial interests.

In Stark v. Commissioner, 86 T.C. 243 (1986), we held that a gift to the U.S. Forest Service of real property constituted a partial interest where the donor retained a mineral interest in the real property.  The gift to charity, however, of the partial interest was deductible because the particular restricted mineral interest retained by the taxpayer was not regarded as substantial.  In interpreting section 170(f)(3) for income tax purposes, we stated that the partial interest rule "applies to contributions [to charity] of less than the taxpayer's entire interest in property, including, but not limited to, contributions of the right to use property."  Id. at 250.

In Rev. Rul. 81-282, 1981-2 C.B. 78, it was held that a gift to charity of corporate stock constituted a disallowed partial interest where the donor retains the right to vote the gifted stock (a gift not dissimilar from the gift to CFT of the

nonvoting, assignee interest in the MIL partnership).  See also
Stewart et al., Charitable Giving and Solicitation, par. 9004 at
9002 (1999), which states that "A donor can run afoul of the
partial interest rules by retaining a property interest or right
while transferring the primary incidents of ownership to
charity."[1]

As indicated previously, for Federal gift, income, and
estate tax purposes, certain limited statutory exceptions to the
above rule applicable to partial interests are available under
which specified types of partial interests transferred to charity
will qualify for charitable deductions (namely, certain fixed
income transfers to charity and certain remainder interests
gifted to charitable annuity trusts, to unitrusts, and to pooled
income funds).  See secs. 2522(c)(2)(A) and (B) (gift tax),
170(f)(2)(A) and (B) (income tax), 2055(e)(2)(A) and (B) (estate
tax).  These statutorily qualified forms of deductible partial

---

[1] Treatises discussing charitable contributions interpret
the relevant Code provisions as outlined above, and I have not
discerned how the situation involved in the instant case would
not be covered by the above Code provisions disallowing a tax
deduction for gifts to charity of partial interests.  See, e.g.,
8 Mertens, Law of Federal Income Taxation, secs. 31:97 to 31:112
(1999 rev.); Beckwith, 839 Tax Mgmt. (BNA), "Estate and Gift Tax
Charitable Deductions", secs. V, XI at A-50 (2001); Kirschten &
Freitag, 521-2d Tax Mgmt. (BNA), "Charitable Contributions:
Income Tax Aspects", sec. II-F (2002); Samansky, Charitable
Contributions and Federal Taxes, ch. 8 (1993); Stephens et al.,
Federal Estate and Gift Taxation, secs. 5.05, 11.02 (8th ed.
2002); Stewart et al., Charitable Giving and Solicitation, pars.
9001-9012, 10,022, 11,012 (1999).

interest charitable gifts are subject to strict guidelines which provide assurance that the charitable deductions to be allowed reflect the approximate amount to be received by charity.  See sec. 25.2522(c)-3(d)(2)(iv), Gift Tax Regs.

In addition to the above statutorily qualified forms of deductible partial interests transferred to charity, section 170(f)(3)(B) sets forth a number of other types of partial interest gifts with respect to which charitable deductions are allowable.  Under section 170(f)(3)(B), charitable deductions are allowed for gifts not in trust of remainder interests in a personal residence or farm (sec. 170(f)(3)(B)(i)), gifts to charity not in trust of an "undivided portion" of a transferor's entire interest in property (sec. 170(f)(3)(B)(ii)), and qualified conservation contributions (sec. 170(f)(3)(B)(iii)). With regard to charitable gifts of an undivided portion of a transferor's entire interest in property, section 25.2522(c)-3(c)(2)(i), Gift Tax Regs., provides, in part, as follows:

> An undivided portion of a donor's entire interest in property must consist of a fraction or percentage of each and every substantial interest or right owned by the donor in such property * * *.[2]  * * *

---

[2]  Parallel provisions for income and estate tax purposes with regard to deductions relating to charitable gifts of an undivided portion of a taxpayer's entire interest in property are set forth in sec. 1.170A-7(b)(1)(i), Income Tax Regs., and sec. 20.2055-2(e)(2)(i), Estate Tax Regs.

In Stark v. Commissioner, supra at 252-253, we explained as follows:

Where the interest retained by the taxpayer is so insubstantial that he has, in substance, transferred his entire interest in the property, the tax treatment should so reflect. * * *

* * * A charitable contribution deduction should be allowed only where the retained interest has a de minimis value. Moreover, the insubstantial retained interest must not potentially interfere in any manner with the donee's interest. * * *  [Citation omitted.]

In Rev. Rul. 81-282, 1981-2 C.B. 78, it was concluded that a taxpayer's retention of a right to vote shares of stock contributed to charity constitutes a substantial right because a right to vote gives the holder a voice in the management of the company and is crucial to protecting a stockholder's financial interest.

In Miami Natl. Bank v. Commissioner, 67 T.C. 793, 800 (1977), (involving the transfer of stock into a subordinated securities account), we concluded that retained voting rights, among others, constitute substantial rights.

Application to McCord

As stated, the retained rights involved in Rev. Rul. 81-282, 1981-2 C.B. 78, appear to be analogous to the rights retained by petitioners herein. By providing in the MIL partnership agreement limitations on transfers of MIL partnership interests and by transferring to CFT only an assignee interest in MIL,

petitioners retained the voting and the other rights in the MIL limited partnership associated with the assignee interest transferred to charity. Because the rights retained by petitioners with regard to their MIL limited partnership interest would be treated as substantial, under section 170(f)(3)(B)(ii) the portion thereof transferred to CFT would appear not to qualify as an undivided portion of petitioners' entire MIL limited partnership interest.

I would reiterate that it is the perceived substantial significance of petitioners' retained rights on which petitioners themselves, petitioners' valuation experts, and the majority opinion rely to justify assignee status and increased valuation discounts for the gifted interest.

It would appear that for the above analysis not to apply to the gift involved in the instant case, petitioners' MIL limited partnership interest would have to be interpreted as consisting of two separate and distinct interests (an economic interest and a noneconomic interest) with petitioners transferring to CFT an undivided portion of the separate economic interest.

I submit that the correct interpretation would be to treat petitioners' MIL limited partnership interest as one interest consisting of both economic and noneconomic rights, with petitioners having transferred to CFT only their economic rights therein. Under this interpretation, it would appear that

petitioners should be regarded as having made a charitable gift to CFT of a partial interest in their MIL limited partnership interest, which charitable gift would be subject to the gift tax disallowance provision of section 2522(c)(2).[3]

---

[3] I recognize that under the disallowance rule of sec. 2522(c)(2), as suggested herein, petitioners' claimed charitable deduction for their gift to Symphony also would be disallowed as a gift of a partial interest.

CHIECHI, J., concurring in part and dissenting in part: I concur in result with respect to the portions of the majority opinion under the headings "IV. Extent of the Rights Assigned" and "VII. Effect of Children's Agreement To Pay Estate Tax Liability".

I cannot responsibly cast an affirmative vote with respect to the portion of the majority opinion under the heading "V. Fair Market Value of the Gifted Interest". The determination of fair market value is a factual determination and is necessarily a matter of judgment and approximation. See, e.g., Estate of Davis v. Commissioner, 110 T.C. 530, 537 (1998). I am not in a position to state that I agree with every judgment and every approximation made by the majority opinion in determining the fair market value of the gifted interest. Moreover, because valuation is a factual matter and necessarily an approximation and a matter of judgment, I do not believe that the Court is bound in other cases by the judgments and approximations in the majority opinion.

I dissent from the portion of the majority opinion under the heading "VI. Charitable Contribution Deduction for Transfer to CFT" and from the ultimate holding of the majority opinion under the heading "VIII. Conclusion". Although I join Judge Foley's dissent, I write separately to express additional reasons for my

dissent and to emphasize certain of the reasons for Judge Foley's dissent.

I disagree with the following characterization by the majority opinion of what petitioners transferred to CFT under the assignment agreement: "By way of the assignment agreement, petitioners transferred to CFT the right to a portion of the gifted interest." Majority op. p. 61 (emphasis added). Under the assignment agreement, petitioners did not transfer to CFT merely "the right to" a specified portion of the gifted interest. On January 12, 1996, petitioners transferred to CFT the portion of the gifted interest described in that agreement. In other words, on that date, petitioners transferred to CFT that portion, if any, of the 82.33369836-percent assignee interest in MIL remaining after the respective transfers under the assignment agreement to petitioners' children, the trusts, and the Symphony; i.e., that portion of such assignee interest having a fair market value as of the date of that agreement in excess of $7,044,933.

I also disagree with the position of the majority opinion, see majority op. pp. 61-65, that under the assignment agreement petitioners transferred to CFT a 3.62376573-percent assignee interest in MIL. The 3.62376573-percent assignee interest was set forth in the confirmation agreement that was executed in March 1996. The majority opinion does not mention the confirmation agreement but nevertheless requires that agreement

to control for purposes of determining the assignee percentage interest that petitioners transferred under the assignment agreement to CFT (as well as the respective assignee percentage interests that petitioners transferred under the assignment agreement to petitioners' children, the trusts, and the Symphony).  The confirmation agreement on which the majority opinion relies was not executed until March 1996, 2 months after the assignment agreement was effective, and is not the controlling donative instrument.

Instead of referring to the confirmation agreement in support of the position that petitioners transferred to CFT a 3.62376573-percent assignee interest in MIL, the majority opinion maintains that there is in effect a valuation instruction in the assignment agreement which mandates that result.  According to the majority opinion, pursuant to that purported valuation instruction, the fair market value agreed upon by the donees to determine the assignee percentage interest transferred to CFT (as well as to determine the respective assignee percentage interests transferred to petitioners' children, the trusts, and the Symphony) is fixed and may never change for purposes of determining such interest, even if such value agreed upon by the donees is ultimately determined not to be the fair market value of such interest.  The majority opinion concludes that therefore the resulting assignee percentage interest transferred to CFT (as

well as the respective assignee percentage interests transferred to petitioners' children, the trusts, and the Symphony), as set forth in the confirmation agreement, is fixed and may never change.

The assignment agreement does not contain a valuation instruction that requires what the majority opinion indicates that agreement requires.  According to the majority opinion, that valuation instruction appears in the following paragraph in the assignment agreement:

> For purposes of this paragraph [the paragraph transferring to petitioners' children, the trusts, the Symphony, and CFT certain portions of the 82.33369836- percent assignee interest in MIL that petitioners transferred under the assignment agreement], the fair market value of the Assigned Partnership Interest [the gifted interest consisting of the 82.33369836-percent assignee interest in MIL] as of the date of this Assignment Agreement shall be the price at which the Assigned Partnership Interest would change hands as of the date of this Assignment Agreement between a hypothetical willing buyer and a hypothetical willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.  Any dispute with respect to the allocation of the Assigned Partnership Interests among Assignees shall be resolved by arbitration as provided in the Partnership Agreement.

As can be seen from reading the foregoing paragraph, the purported valuation instruction consists of a paragraph in the assignment agreement which defines the term "fair market value". Petitioners required the donees to use that definition when they allocated among themselves the respective portions of the gifted interest which petitioners transferred to them under the

assignment agreement. The definition of the term "fair market value" for that purpose is the same definition used for Federal gift tax purposes. See sec. 25.2512-1, Gift Tax Regs. The last sentence of the above-quoted paragraph merely requires that any dispute with respect to the allocation of the gifted interest among the donees be resolved by arbitration as provided in the partnership agreement. Nothing in that paragraph mandates that if the fair market value of the gifted interest to which the various donees agreed is ultimately determined not to be the fair market value of that interest, no adjustment may be made to the respective assignee percentage interests allocated to CFT and the other donees, as set forth in the confirmation agreement. I believe that the majority opinion's construction of the above-quoted paragraph is strained, unreasonable, and improper and leads to illogical results.

In essence, the majority opinion concludes that the <u>donees</u> of the gifted interest made a mistake in determining the fair market value of that interest and that <u>petitioners</u> are stuck with that mistaken value <u>solely</u> for purposes of determining the respective assignee percentage interests transferred to the donees under that agreement.

The majority opinion states that

the assignment agreement contemplates the allocation of the gifted interest based on the assignees' best estimation of that value. Moreover, each of the assignees' percentage interests was determined

exactly as contemplated in the assignment agreement (without recourse to arbitration), and none can complain that they got any less or more than petitioners intended them to get. * * * [Majority op. p. 63.]

The assignment agreement does not "contemplate", as the majority opinion states, that the allocation of the gifted interest be "based on the assignees' best estimation of that [fair market] value." Id. Under the assignment agreement, petitioners transferred to the donees specified portions of the gifted interest determined by reference to the fair market value of such portions, as defined in that agreement, and not upon some "best estimation of that value."

The assignment agreement required that the allocation be based upon fair market value as defined in that agreement, which the majority opinion acknowledges is the same definition of that term for Federal gift tax purposes. The majority opinion has found that the donees did not make the allocation on the basis of that definition. The donees thus failed to implement the donors' (i.e., petitioners') mandate in the assignment agreement when they arrived at amounts which they believed to be the respective fair market values of the specified portions of the gifted interest that petitioners transferred to them but which the majority opinion has found are not the fair market values of such portions.

The majority opinion, using the definition of fair market value in the Federal gift tax regulations and the assignment agreement, determines that the fair market value of the gifted interest used by the donees is not the fair market value of such interest. It follows that the assignee percentage interest allocated to CFT in the confirmation agreement in March 1996 (as well as the respective assignee percentage interests allocated in that confirmation agreement to petitioners' children, the trusts, and the Symphony) is not the assignee percentage interest that petitioners transferred in the assignment agreement to that donee on January 12, 1996.

The position of the majority opinion conflicts with the provisions of the assignment agreement as to the respective portions of the gifted interest that petitioners transferred under that agreement to petitioners' children, the trusts, the Symphony, and CFT. Consequently, that position leads to results that are in violation of what petitioners transferred to the donees under that agreement. According to the majority opinion, the aggregate fair market value of the aggregate 77.21280956-percent assignee interests allocated to petitioners' children and the trusts is $9,269,089. Majority op. p. 64. However, under the assignment agreement, petitioners transferred to their children and the trusts portions of the gifted interest having an aggregate fair market value equal to $6,910,933, determined

according to the definition of the term "fair market value" in
the assignment agreement, which is the same definition in the
Federal gift tax regulations.[1]  Thus, the aggregate fair market
value of the aggregate assignee percentage interests transferred
to petitioners' children and the trusts, as determined by the
majority opinion (i.e., $9,269,089), exceeds the aggregate fair
market value of such interests that petitioners transferred to
those donees in the assignment agreement (i.e., $6,910,933).
Such a result is rejected by and violates that agreement.[2]

FOLEY, J., agrees with this concurring in part and
dissenting in part opinion.

---

[1]According to the majority opinion, the fair market value of
the 1.49712307-percent assignee interest allocated to the
Symphony is $179,724.  Majority op. p. 64.  However, under the
assignment agreement, petitioners transferred to the Symphony a
portion of the gifted interest having an aggregate fair market
value of at most $134,000, determined according to the definition
of the term "fair market value" in the assignment agreement,
which is the same definition in the Federal gift tax regulations.

[2]The same is true of the result with respect to the Symphony
under the majority opinion's analysis.

FOLEY, J., concurring in part[1] and dissenting in part:
Undaunted by the facts, well-established legal precedent, and
respondent's failure to present sufficient evidence to establish
his determinations, the majority allow their olfaction to
displace sound legal reasoning and adherence to the rule of law.
The gift closed on January 12, 1996, and on that date petitioners
transferred to CFT all of petitioners' assigned partnership
interests exceeding $7,044,933 (i.e., the amount exceeding the
$6,910,933 transferred to the sons and the trusts plus the
$134,000 transferred to the Symphony).

As the trial judge, I concluded that, on January 12, 1996,
petitioners transferred a $2,838,899 assignee interest to CFT.
On that date, the interest was accepted and received by CFT, and
not subject to a condition precedent or subsequent.  Sec.
25.2522(c)-3(b)(1), Gift Tax Regs.; see also Commissioner v.
Sternberger's Estate, 348 U.S. 187 (1955); Hamm v. Commissioner,
T.C. Memo. 1961-347, affd. 325 F.2d 934 (8th Cir. 1963).
Furthermore, I concluded that respondent fell woefully short of
meeting his burden[2] regarding the applicability of the substance
over form, violation of public policy, and reasonable probability

---

[1]  I concur only in result with respect to secs. IV, V(E),
and VII(C) of the majority opinion.

[2]  The parties agree that respondent, pursuant to sec. 7491,
had the burden of proof.

of receipt doctrines.[3]  Inexplicably, the majority ignore

respondent's primary contentions (i.e., that the substance over

form and violation of public policy doctrines are applicable) and

base their holding on an interpretation of the assignment

agreement that respondent never raised.  In section I, I address

the majority's holding.  In sections II and III, respectively, I

address respondent's contentions relating to the substance over

form and violation of public policy doctrines.

I.   The Majority's Analysis of the Assignment Agreement Is
     Faulty

The majority begin by stating correctly that the "gift tax

is imposed on the value of what the donor transfers, not what the

donee receives."  Majority op. p. 60.  Yet, they then proceed to

rely on a tortured analysis of the assignment agreement that is,

ostensibly, justification for shifting the determination of

transfer tax consequences from the date of the transfer (i.e.,

January 12, 1996, the date of the assignment setting forth what

petitioners transferred) to March 1996 (i.e., the date of the

confirmation agreement).  The majority's analysis of the

assignment agreement requires that petitioners use the Court's

valuation to determine the value of the transferred interests,

but the donees' appraiser's valuation to determine the percentage

---

[3]  The reasonable probability of receipt doctrine was not
one of respondent's primary contentions, but it was referenced in
his opening brief.

interests transferred to the charitable organizations.  There is no factual, legal, or logical basis for this conclusion.

A.    The Gift Was Complete on January 12, 1996

The value of the transferred property and the amount of the transferor's charitable deduction are determined as of the date the gift became complete.  Sec. 2512(a).  Pursuant to Texas law, the transfer became complete on January 12, 1996, the date petitioners and the donees executed the assignment agreement.  In fact, respondent states:

> It is undisputed that the January 12, 1996 Assignment Agreement was executed by competent donors, evidenced the donors' present intent to irrevocably divest themselves of ownership of the partnership interests, delivered to the partnership, and signed and accepted by donees competent to receive such a transfer.  Accordingly, the Assignment Agreement effected the present transfer under Texas law of beneficial and legal title to the partnership interests to the donees. (Emphasis added.)

The Court, like petitioners and respondent, is bound by section 2512(a), which requires us to value the property "at the date of the gift" (emphasis added).  The charitable donees and the amount allocated to them were specifically identified, and thus ascertainable, upon the execution of the assignment agreement.  Respondent readily acknowledges, and petitioners undoubtedly agree, that the January 12, 1996, assignment agreement was "signed and accepted by donees competent to receive such a transfer."  Yet, in determining the charitable deduction, the majority rely on the confirmation agreement without regard to

the fact that petitioners were not parties to this agreement, and that this agreement was executed by the donees more than 2 months after the transfer.[4]

The majority state that the property transferred to CFT "was not expressed as a specific fraction of the gifted interest (e.g., one-twentieth), nor did petitioners transfer to CFT a specific assignee interest in MIL (e.g., a 3-percent assignee interest)." Majority op. p. 61. The majority appear to assert, without any authority, that petitioners' charitable deduction cannot be determined unless the gifted interest is expressed in terms of a percentage or fractional share.[5] The assignment agreement specifically identified the transferees and the transferred property. Regardless of how the transferred interest was described, it had an ascertainable value.

---

[4] Subsequent events typically do not affect the value of transferred property. See Ithaca Trust Co. v. United States, 279 U.S. 151 (1929); Estate of McMorris v. Commissioner, 243 F.3d 1254 (10th Cir. 2001), revg. T.C. Memo. 1999-82; Estate of Smith v. Commissioner, 198 F.3d 515 (5th Cir. 1999), revg. 108 T.C. 412 (1997); Propstra v. United States, 680 F.2d 1248 (9th Cir. 1982).

[5] This position is reminiscent of previous attempts by respondent to impose a fractional, or percentile, share rule in the marital deduction context--a position that was consistently rejected by the courts and not implemented until Congress amended sec. 2056 to conform with respondent's position. See sec. 2056(b)(5), (7) and (10); Northeastern Pa. Natl. Bank & Trust Co. v. United States, 387 U.S. 213 (1967); James v. United States, 366 U.S. 213 (1961); Estate of Alexander v. Commissioner, 82 T.C. 34 (1984), affd. without published opinion 760 F.2d 264 (4th Cir. 1985).

Accordingly, pursuant to section 2501, the entire $9,883,832 transfer is subject to gift tax, and a charitable deduction is allowed for the $2,972,899 (i.e., $9,883,832 - $6,910,933) transferred to or for the use of the Symphony and CFT.  Sec. 2522.  CFT's retention of a much smaller interest (i.e., 3.62376573 percent) than what petitioners transferred to it has no effect on the value of the transferred property on the date the gift became complete.[6]

B.    Determination by the Donees Does Not Bind This Court

The majority conclude that petitioners may deduct the $2,838,899 (i.e., $9,883,832 - $7,044,933) transferred to CFT on January 12, 1996, only if the agreement gave each donee "an enforceable right to a fraction of the gifted interest determined with reference to the fair market value of the gifted interest as finally determined for Federal gift tax purposes".  Majority op. p. 63 (emphasis added).  Simply put, the majority are wrong.

First, a $2,838,899 MIL interest was transferred to or for the use of CFT.  In their fervor to reject this transaction, the

---

[6]  CFT's subsequent transfer of MIL interests may have conferred an impermissible private benefit on petitioners' sons. See Am. Campaign Acad. v. Commissioner, 92 T.C. 1053 (1989)(holding that conferral of a benefit on an unrelated person may constitute an impermissible private benefit).  The deduction pursuant to sec. 2522 is not allowed for a transfer to an organization unless such organization is operated exclusively for one or more of its charitable purposes.  Sec. 25.2522(a)-1(b), Gift Tax Regs.  Respondent, however, did not raise, or present any evidence relating to, this issue.

majority assert a line of analysis that is contrary to both the established facts and respondent's litigating position.  Pursuant to the assignment agreement, the gift closed, and beneficial and legal title to the assigned interest was transferred to CFT on January 12, 1996.  Respondent contends that, irrespective of when the gift closed, the Court must ignore all intermediate steps and focus on the end result (i.e., the cash received in redemption).  The majority sidestep the assignment agreement and redemption, and focus on the allocation in the confirmation agreement.

Second, the majority cite regulations that are inapplicable to petitioners' transfer.  See sec. 1.664-2(a)(1)(iii), Income Tax Regs. (relating to charitable remainder annuity trusts); sec. 20.2055-2(e)(2)(v) and (vi)(a), Estate Tax Regs. (relating to guaranteed annuity interests), and 25.2702-3(b)(1)(ii)(B) and (b)(2), Gift Tax Regs. (relating to qualified annuity interests).  Majority op. pp. 63-64 note 46.  The deductibility of all transfers to charities is not governed by these requirements.

Third, as the majority acknowledge, petitioners transferred to the donees "a fraction of the gifted interest based on the value of that interest as determined under Federal gift tax valuation principles."  Majority op. p. 62.  There is no material difference between fair market value "as determined under Federal gift tax valuation principles" and fair market value "as finally determined for Federal gift tax purposes".  Once this Court's

jurisdiction is properly invoked, the fair market value of any
property is what this Court determines it is, and a determination
relating to a charitable deduction pursuant to section 2522
requires use of the Court's fair market value of the transferred
property.  Our determination of fair market value is both fair
market value under gift tax principles and as finally determined
for Federal gift tax purposes.  Moreover, had petitioners'
assignment agreement included the magical words "as finally
determined for Federal gift tax purposes", the majority assert
only that they "might have reached a different result."  Majority
op. p. 63.

> Fourth, the majority state:

> There is simply no provision in the assignment
> agreement that contemplates the allocation of the
> gifted interest among the assignees based on some
> fixed value that might not be determined for several
> years.  Rather, the assignment agreement contemplates
> the allocation of the gifted interest based on the
> assignees' best estimation of that value.  [Majority
> op. pp. 62-63.]

The fact is, the assignment agreement effected the transfer of an
assignee interest.  Petitioners' assignment agreement could not,
and does not, limit the Court's ability to correctly determine
the fair market value of such interest.  Nor could the assignment
agreement mandate that the donees' determination of fair market
value is conclusive and final for gift tax purposes.

Finally, unlike respondent, who contends that the charitable
deduction is limited to the $338,967 CFT received in the

redemption, the majority seek to restrict petitioners' charitable deduction to the $435,019 interest (i.e., 3.62376573 percent) CFT retained pursuant to the confirmation agreement. In essence, the reasoning set forth by the majority borrows from both the integrated transaction and violation of public policy doctrines. The majority's disregard of the transfer of property interests pursuant to the assignment agreement, and focus on the allocation of interests pursuant to the confirmation agreement, implicates the integrated transaction doctrine. Similarly, the majority's refusal to adhere to the explicit terms of the assignment agreement implicates the violation of public policy doctrine.

II. <u>Respondent Did Not Establish Applicability of the Substance Over Form Doctrine</u>

Respondent contended that formation of the limited partnership, assignment of partnership interests, confirmation of the assignment, and redemption of the charities' partnership interests were all part of an integrated transaction where petitioners intended to transfer all of their assets to their sons and the trusts. Respondent simply failed to meet his burden.

Courts have employed the substance over form doctrine where a taxpayer, intending to avoid the gift tax, transfers property to an intermediary who then transfers such property to the intended beneficiary.[7] In some instances the intermediary was

---

[7] The Court of Appeals for the Fifth Circuit and other
(continued...)

used to disguise the transferor. See Schultz v. United States, 493 F.2d 1225, 1226 (4th Cir. 1974) (finding that brothers planned to avoid gift taxes through repeated reciprocal gifts to each others' children); Griffin v. United States, 42 F. Supp.2d 700, 707 (W.D. Tex. 1998) (finding that husband and wife engaged in a scheme where the wife "was merely the intermediary through which the stock passed on its way to the ultimate beneficiary"); Estate of Murphy v. Commissioner, T.C. Memo. 1990-472 (disregarding an intrafamily stock transfer where the Court found an informal family agreement to control the stock collectively). In Heyen v. United States, 945 F.2d 359 (10th Cir. 1991) (disregarding as shams 27 transfers of stock to intermediate beneficiaries who then transferred the stock to the original transferor's family), however, the intermediary was used in an attempt to disguise the transferee. Respondent, relying on Heyen, asserts that the Symphony and CFT were merely intermediaries in petitioners' plan to transfer their MIL interests to their sons and the trusts.

In Heyen, a taxpayer, seeking to avoid the gift tax by taking advantage of the annual gift tax exclusion, transferred stock to 29 intermediate recipients, all but two of whom made

---

⁷(...continued)
courts have been reluctant to use substance over form in certain cases involving completed gifts to charity. E.g., Carrington v. Commissioner, 476 F.2d 704 (5th Cir. 1973) (holding, in an income tax case, that where respondent seeks to use the step transaction doctrine to disregard a donation of appreciated property to a charitable organization, the central inquiry is whether the donor parted with all dominion and control), affg. T.C. Memo. 1971-222.

blank endorsements of the stock, which the issuing bank

subsequently reissued to the intended beneficiaries.  The court

stated:

> The [intermediate] recipients either did not know they
> were receiving a gift of stock and believed they were
> merely participating in stock transfers or had agreed
> before receiving the stock that they would endorse the
> stock certificates in order that the stock could be
> reissued to decedent's family. [Id. at 361.]

The court further stated:

> The evidence at trial indicated decedent intended to
> transfer the stock to her family rather than to the
> intermediate recipients.  The intermediary recipients
> only received the stock certificates and signed them in
> blank so that the stock could be reissued to a member
> of decedent's family.  Decedent merely used those
> recipients to create gift tax exclusions to avoid
> paying gift tax on indirect gifts to the actual family
> member beneficiaries. [Id. at 363.]

In order for us to ignore petitioners' allocation in the

assignment agreement, respondent must establish that petitioners

coordinated, and the charities colluded in or acquiesced to, a

plan to avoid petitioners' gift taxes by undervaluing the

transferred interests and intended to divert CFT's interest to

their sons and the trusts.  See Heyen v. United States, supra;

Schultz v. United States, supra; Griffin v. United States, supra;

Estate of Murphy v. Commissioner, supra.  Respondent did not

present the requisite evidence for us to invoke the substance

over form doctrine.

Respondent stated on brief that, after execution of the

assignment agreement, petitioners "washed their hands" of the

transaction, and the donees took over.  Petitioners' sons'

involvement in the subsequent allocation of the transferred

interests does not affect the petitioners' gift tax liability,

particularly in the absence of a showing that petitioners

retained some control over the subsequent allocation.  See sec.

25.2511-2(a), Gift Tax Regs. (stating that the gift tax is

measured by the value of the property passing from the donor).

Petitioners' sons and the estate planner made all the

arrangements relating to the valuation.  This Court, however,

will not impute to petitioners an intent to avoid the gift tax

merely from the appraiser's valuation of the transferred

partnership interests, the sons' involvement in the planning

process, or the hiring of an estate planner charged with tax

minimization.  See Estate of Strangi v. Commissioner, 115 T.C.

478, 484-485 (2000) ("Mere suspicion and speculation about a

decedent's estate planning and testamentary objectives are not

sufficient to disregard an agreement in the absence of persuasive

evidence"), revd. on other grounds 293 F.3d 279 (5th Cir. 2002);

Hall v. Commissioner, 92 T.C. 312 (1989).

Respondent failed to establish that the Symphony or CFT

participated, knowingly or otherwise, in a plan to facilitate

petitioners' purported avoidance of gift tax.  Indeed, the

testimony and evidence established that the Symphony and CFT

acted independently.  CFT did not hire its own appraiser because

it had confidence in the appraiser hired by petitioners' sons.

While in hindsight (i.e., after this Court's valuation) it was

imprudent for the charitable organizations to forgo an independent appraisal,[8] these organizations were not sham intermediaries. Prior to signing the confirmation agreement, the Symphony and CFT could have independently valued MIL, forced arbitration, and thwarted any purported plan to avoid the gift tax. Cf. Compaq v. Commissioner, 277 F.3d 778, 784 (5th Cir. 2001) (declining, in an income tax case, to disregard a transaction that involved even a minimal amount of risk and was conducted by entities separate and apart from the taxpayer), revg. 113 T.C. 214 (1999).

There is no evidence of an implicit or explicit agreement, between petitioners and either the Symphony or CFT, that the Symphony or CFT would accept less than that which petitioners transferred to each organization. In fact, respondent stipulated that "Before the call right was exercised, there was no agreement among Mr. or Mrs. McCord, the McCord brothers, the Symphony or CFT as to when such a buyout would occur or to the price at which the buyout would occur."

In sum, respondent failed to establish that the undervaluation of MIL, reallocation of MIL interests, and

---

[8] Ms. Willhoite, president of the Symphony, and Mr. Fjordback, president of CFT, each had an obligation to ensure receipt of the property interests petitioners transferred to the Symphony and CFT, respectively. See Tex. Socy. DAR, Inc. v. Ft. Bend Chapter, 590 S.W.2d 156, 164 (Tex. Civ. App. 1979), (citing Intl. Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567 (Tex. Sup. Ct. 1963)); see also Texas Non-Profit Corporation Act, Tex. Rev. Civ. Stat. art. 1396-2.22 (2002).

subsequent transfer of a portion of CFT's MIL interest to the sons and the trusts, were parts of a plan by petitioners to avoid the gift tax.  CFT's retention of a much smaller interest (i.e., 3.62376573 percent) than petitioners transferred, pursuant to the assignment agreement, has no effect on the value of the transferred property on January 12, 1996, the date the gift became complete.

III. Formula Clause Does Not Violate Public Policy

Relying primarily on Commissioner v. Procter, 142 F.2d 824 (4th Cir. 1944), respondent contended that petitioners' formula clause was against public policy, and therefore void, because such clause "is a 'poison pill' created to discourage audit of the gifts and to fabricate phantom charitable gift and income tax deductions."

In Commissioner v. Procter, supra, the court considered a clause causing a gift to revert to the donor if a court determined that the gift was taxable.  The court held that such a clause "is clearly a condition subsequent and void because contrary to public policy."  Id. at 827.  The court reasoned that the clause would discourage the collection of tax because attempted collection would defeat the gift, the clause would "obstruct the administration of justice by requiring the courts to pass upon a moot case", and the clause, if allowed to stand, would defeat the judgment of a court.  Id.  Likewise, in Ward v. Commissioner, 87 T.C. 78 (1986), a clause allowed the taxpayer to

revoke a gift of stock if it was determined that, for gift tax purposes, the fair market value of such stock exceeded $2,000 per share.  The Court similarly concluded that such a clause was a condition subsequent and void because it was against public policy.

Contrary to the valuation clauses in Commissioner v. Procter, supra, and Ward v. Commissioner, supra, which adjusted the amount transferred based upon a condition subsequent, petitioners' valuation clause defined the amount of property transferred.  Simply put, petitioners' gift does not fail upon a judicial redetermination of the transferred property's value.  Petitioners made a legally enforceable transfer of assignee interests to CFT, with no provision for the gift to revert to petitioners or pass to any other party on the occurrence of adverse tax consequences.  CFT merely failed to protect its interest adequately.  Procter and Ward are distinguishable.  Petitioners' formula clause was not against public policy.

IV.  Conclusion

The majority seek to restrict petitioners' charitable deduction to that which CFT accepted in the confirmation agreement.  The parties agree that the gift closed upon the execution of the assignment agreement.  At that moment, petitioners transferred and CFT had a $2,838,899 MIL interest.  CFT waived its arbitration rights, and petitioners did not participate in the subsequent allocation.  Whether CFT failed to

adequately protect its interest or was swindled by petitioners' sons does not affect the value of what petitioners transferred to CFT.

The majority prudently avoid using the substance over form, violation of public policy, or realistic possibility of receipt doctrines as support for their holding.  The majority, however, disregard the assignment agreement, other established facts, and applicable case law in order to support a line of analysis and conclusion that even respondent did not advocate.  We are not responsible for protecting the fisc.  Rather, our role and duty are to interpret and adhere to the rule of law--even if uncomfortable with the result.

CHIECHI, J., agrees with this concurring in part and dissenting in part opinion.

LARO, J., dissenting:  A thin majority holds today that "each petitioner is entitled to a charitable contribution deduction under section 2522 of $207,510 resulting from the transfer to CFT [Communities Foundations of Texas, Inc.]." Majority op. at 65.  Each petitioner reported for that transfer a charitable deduction of $162,172.60, and CFT is not entitled to enjoy any funds in excess of that amount.  In that the majority respects the subject transaction and allows each petitioner to deduct a charitable contribution of approximately $45,000 for value that a charity will never enjoy, I dissent.

### 1.  Majority Applies Its Own Approach

To reach the result that the majority desires, the majority decides this case on the basis of a novel approach neither advanced nor briefed by either party and concludes that the Court need not address respondent's arguments as to public policy and integrated transaction.  Majority op. p. 64 note 47. Specifically, under the majority's approach (majority's approach), the term "fair market value" as used in the assignment agreement denotes simply the value ascertained by the parties to that agreement (or, in certain cases by an arbitrator) and not the actual amount determined under the firmly established hypothetical willing buyer/hypothetical willing seller test that has been a fundamental part of our Federal tax system for decades on end.  Majority op. p. 64 note 47; see also United States v. Cartwright, 411 U.S. 546, 550-551 (1973) ("The willing buyer-

willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves"). Whereas the majority ostensibly recognizes that firmly established test in its determination of the fair market value of the subject property, majority op. p. 64 note 46, the majority essentially holds that the parties to the assignment agreement are not bound by that test when they themselves ascertain the fair market value of that property, id. at 61-64.

As I understand the majority's rationale, the parties to the assignment agreement are not bound by that test because the assignment agreement only uses the phrase "fair market value" and not the phrase "fair market value as finally determined for Federal gift tax purposes". To my mind, the subject property's fair market value is its fair market value, notwithstanding whether fair market value is ascertained by the parties or "finally determined for Federal gift tax purposes". I know of nothing in the tax law (nor has the majority mentioned anything) that provides that property such as the subject property may on the same valuation date have one "fair market value" when "finally determined" and a totally different "fair market value" if ascertained beforehand.[1] The majority's interpretation of the

---

[1] The three regulatory provisions relied upon by the majority (majority op. p. 64 note 46) in support of its position do not adequately support that position. Sec. 1.664-2(a)(1)(iii), Income Tax Regs., for example, uses the phrase

(continued...)

assignment agreement is at odds with the interpretation given
that agreement by not only the trial Judge, but by both parties
as well.

The majority allows petitioners an increased charitable
contribution that would be disallowed under either the public
policy or integrated transaction doctrine.  In that both of these
doctrines are fundamental to a proper disposition of this case,
it is incumbent upon the Court to address one or both of them.
The majority inappropriately avoids discussion of these doctrines
by relying on the principle that the Court "may approve a
deficiency on the basis of reasons other than those relied upon
by the Commissioner".  Majority op. p. 64 note 47.  The majority,
however, fails to recognize that the majority is not approving
respondent's deficiency in full but is rejecting a portion of it.
In fact, the majority even acknowledges that "the application of
respondent's integrated transaction theory would result in an
initial increase in the amount of petitioners' aggregate taxable
gift by only $90,011".   Id.  Whereas the majority attempts to
downsize the significance of a $90,011 adjustment by
recharacterizing it as "only" and "less than 1 percent", id., the
fact of the matter is that the dollar magnitude of a $90,011

---

[1](...continued)
"fair market value * * * incorrectly determined by the fiduciary"
to refer to an earlier determination of fair market value that is
inconsistent with the fair market value "finally determined for
Federal tax purposes".

increase is significant to the fisc (as well as to most people in general) notwithstanding that it may constitute a small percentage of the aggregate taxable gift as found by the majority.[2]  I know of no principle of tax law (nor has the majority cited one) that provides that an adjustment otherwise required by the tax law is inappropriate when it is a small percentage of a base figure such as aggregate taxable gifts.

2.  <u>Increased Charitable Deduction Is Against Public Policy</u>

Allowing petitioners to deduct as a charitable contribution the increase in value determined by the Court is against public policy and is plainly wrong.  No one disputes that CFT will never benefit from the approximately $45,000 that each petitioner is entitled to deduct as a charitable contribution pursuant to the majority opinion.  Nor does anyone dispute that the only persons benefiting from the increased value are petitioners and that the only one suffering any detriment from the increased value is the fisc.  I do not believe that Congress intended that individuals such as petitioners be entitled to deduct charitable contributions for amounts not actually retained by a charity.  See <u>Hamm v. Commissioner</u>, T.C. Memo. 1961-347 (charitable contribution under sec. 2522 requires "a reasonable probability

---

[2] The majority does not state what the $90,011 is less than 1 percent of.  I believe the majority is referring to the relationship of the $90,011 to the aggregate taxable gift as found by the majority.

that the charity actually will receive the use and benefit of the gift, for which the deduction is claimed"), affd. 325 F.2d 934 (8th Cir. 1963).

I would deny a charitable deduction for the increased value by applying to this case a public policy doctrine that is similar to the doctrine applied by the Courts in Commissioner v. Procter, 142 F.2d 824, 827 (4th Cir. 1944), revg. on other grounds a Memorandum Opinion of this Court, and Ward v. Commissioner, 87 T.C. 78 (1986). In Commissioner v. Procter, supra, the taxpayer transferred certain property interests to a trust benefiting his children. The trust instrument provided that, if a competent Federal court of last resort should find any part of the transfer to be subject to gift tax, then that portion of the property subject to such tax would not be considered to have been transferred to the trust. The Court of Appeals for the Fourth Circuit declined to respect this adjustment provision. The court stated:

> We do not think that the gift tax can be avoided by any such device as this. Taxpayer has made a present gift of a future interest in property. He attempts to provide that, if a federal court of last resort shall hold the gift subject to gift tax, it shall be void as to such part of the property given as is subject to the tax. This is clearly a condition subsequent and void because contrary to public policy. A contrary holding would mean that upon a decision that the gift was subject to tax, the court making such decision must hold it not a gift and therefore not subject to tax. Such holding, however, being made in a tax suit to which the donees of the property are not parties, would not be binding upon them and they might later enforce

> the gift notwithstanding the decision of the Tax Court.
> It is manifest that a condition which involves this
> sort of trifling with the judicial process cannot be
> sustained.  [Id. at 827. * * *]

The court also noted that the adjustment clause was contrary to public policy because:  (1) Public officials would be discouraged from attempting to collect the tax since the only effect would be to defeat the gift; (2) the adjustment provision would tend to obstruct the administration of justice by requiring the court to address a moot case; and (3) the provisions should not be permitted to defeat a judgment rendered by the court.  Id.

We followed Procter in Ward v. Commissioner, supra.  In Ward, the taxpayers, husband and wife, each transferred 25 shares of stock to each of their three sons.  At the time of the gifts, the taxpayers and their sons executed a "gift adjustment agreement" that was intended to ensure that the taxpayers' gift tax liability for the stock transfers would not exceed the unified credit against gift tax that the taxpayers were entitled to at that time.  Id. at 87-88.  The agreement stated that, if it should be finally determined for Federal gift tax purposes that the fair market value of the transferred stock either was less than or greater than $2,000 per share, an adjustment would be made to the number of shares conveyed so that each donor would have transferred $50,000 worth of stock to each donee.  Id.  We concluded that the fair market value of the stock exceeded $2,000 per share for each of the relevant years.  Id. at 109.

More importantly, we declined to give effect to the gift adjustment agreement.  We noted that honoring the adjustment agreement would run counter to the policy concerns articulated in Commissioner v. Procter, supra.  Ward v. Commissioner, supra at 113.  We also concluded that upholding the adjustment agreement would result in unwarranted interference with the judicial process, stating:

> Furthermore, a condition that causes a part of a gift to lapse if it is determined for Federal gift tax purposes that the value of the gift exceeds a given amount, so as to avoid a gift tax deficiency, involves the same sort of "trifling with the judicial process" condemned in Procter.  If valid, such condition would compel us to issue, in effect, a declaratory judgment as to the stock's value, while rendering the case moot as a consequence.  Yet, there is no assurance that the petitioners will actually reclaim a portion of the stock previously conveyed to their sons, and our decision on the question of valuation in a gift tax suit is not binding upon the sons, who are not parties to this action.  The sons may yet enforce the gifts. [Id. at 114.]

Here, CFT receives no benefit from the Court-determined increase in the value of the subject property, but petitioners benefit in that they are entitled to an additional charitable deduction.  As was true in Commissioner v. Procter, supra, the possibility of an increased charitable deduction serves to discourage respondent from collecting tax on the transaction because any attempt to enforce the tax due on the transaction is of no advantage to the fisc.

3.  Each Step of the Transaction Is Part of an Integrated Transaction

All of the steps which were taken to effect the transfer of petitioners' partnership interests to their sons (inclusive of the trusts) were part of a single integrated transaction. The purpose of that transaction was to transfer the interests with an avoidance of Federal gift taxes, while, at the same time, discouraging audit of the transfer and manufacturing phantom charitable gift and income tax deductions in the event that the value of the transfer was later increased. I reach my conclusion in light of the following facts which were found by the trial judge or are reasonable inferences therefrom: (1) Petitioners were seeking expert advice on the transfer of their wealth with minimal tax consequences, (2) the transaction contemplated that the charities would be out of the picture shortly after the gift was made, (3) the transfers of the partnership interests to the charities were subject to a call provision that could be exercised at any time, (4) the call provisions were exercised almost contemporaneously with the transfers to the charities, (5) the call price was significantly below fair market value, (6) the charities never obtained a separate and independent appraisal of their interests (including whether the call price was actually the fair market value of those interests), (7) neither charity ever had any managerial control over the partnership, (8) the charities agreed to waive their arbitration

rights as to the allocation of the partnership interests, and (9) petitioners' sons were at all times in control of the transaction. I also query as to this case why a charity would ever want to receive a minority limited partnership interest, but for an understanding that this interest would be redeemed quickly for cash, and find relevant that the interest was subject to the call provision that could be exercised at any time.

4. Conclusion

The majority has placed its stamp of approval on a transaction that not only is a prime example of clear taxpayer abuse but has as its predominant (if not sole) purpose the avoidance of Federal taxes. The majority has done so either because it does not recognize the abuse or, more likely, that it feels impotent to stop the abuse. The majority has gone as far as to condone taxpayer-abusive behavior by allowing petitioners to deduct a charitable contribution for amounts which will never benefit a charity. For these and the other reasons stated herein, I dissent.

VASQUEZ, J., agrees with this dissenting opinion.